**Stanley HERSHFANG, on behalf of himself and all others similarly situated, Plaintiff,**

v.

**CITICORP, John S. Reed and Thomas Jones, Defendant.**

**No. 90 Civ. 8178 (MBM).**

United States District Court, S.D. New York.

June 24, 1991.

Jules Brody, Stull, Stull & Brody, and Robert I. Harwood and Andrew Davidovits, Wechsler, Skirnick, Harwood, Halebian & Feffer, New York City, for plaintiff.

Kenneth A. Caruso, Joseph T. McLaughlin and Lawrence J. Slattery, Shearman & Sterling, New York City, for defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff Hershfang, on behalf of a purported class of similarly situated shareholders, claims that newspaper reports and dividend announcements were part of a scheme devised by defendants Citicorp, John S. Reed, Citicorp's Chairman, and Thomas Jones, Citicorp's Executive Vice President, to inflate the price of Citicorp stock, in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1988), and Rule 10b–5, 17 C.F.R. § 240.-10b–5 (1990). Defendants move to dismiss the complaint under Fed.R.Civ.P. 9(b) and 12(b)(6), for failure to plead fraud with particularity and to state a claim. Because the present complaint does nothing more than allege what Judge Friendly once called "fraud by hindsight," defendants' motion is granted.

## I.

The following rendition is based entirely on the complaint, whose fact allegations must be accepted as true in connection with a motion to dismiss. *Luce v. Edelstein,* 802 F.2d 49, 52 (2d Cir.1986). As will be seen, the allegations consist of little more than unremarkable facts and excerpts from newspaper articles.

On March 19, 1990, Reed met with securities analysts, and cautioned that the then-current real estate slump could have an effect on the bank, but reassured the analysts by telling them that Citicorp expected to implement "a customary dividend increase" in the 8% to 10% range. Complaint ¶ 19. In response to this announcement, Richard Bove, an analyst at Dean Witter Reynolds, Inc., commented that he was particularly encouraged by the planned dividend increase because "regulators wouldn't let them increase if they were in big trouble." *Id.*

On April 17, 1990, at the bank's annual meeting, Reed again expressed pessimism about the real estate market and its possible effect on earnings, but confirmed his earlier statement to the securities analysts by announcing that Citicorp was increasing its annual dividend by 10% from $1.62 to $1.78 per share. Complaint ¶ 19. The next day, *USA Today* reported that "Reed's gloomy pronouncement about real estate and the bank company's weak earnings report didn't seem to phase Citicorp's directors. They voted Tuesday to raise the firm's dividend to an annual rate of $1.78, up 10% from the previous rate of $1.62." Complaint ¶ 21. Similarly, *The Wall Street Journal* reported that Citicorp was "signaling that the Company expects its operations to remain healthy" by boosting its dividend. Complaint ¶ 22.

On June 21, 1990, in an article partially titled "Citicorp's Chief Comes Under Fire as Earnings Remain Disappointing," *The Wall Street Journal* reported that "[r]ather than knuckle under to calls for greater reserves and more emphasis on short-term profits, Mr. Reed takes a damn-the-torpedoes attitude ... he insists that reserves are adequate and that capital will be re-

plenished through asset sales and retained earnings. New shares will be issued only for a major acquisition, he adds." The article further stated that "[I]n April, Mr. Reed's bravado surfaced again. Citicorp thumbed its nose at critics by announcing a 9.9% increase in the dividend at the same time its write-offs of bad loans soared 79% and first-quarter earnings plunged 56%." Complaint ¶ 23 (brackets and ellipses in complaint).

On July 17, 1990, Citicorp reported net income of $248 million for the second quarter of 1990, compared with $231 million for the first quarter of 1990 and $395 million for the second quarter of 1989. Also, consistent with the decision taken at the annual meeting in April, the Board of Directors declared a quarterly dividend of $0.445 per share. Complaint ¶ 24.

On September 22, 1990, in an article discussing possible dividend cuts by major companies, *The Dallas Morning News* reported that "Citicorp, the nation's largest banking group, said it was in no such trouble. 'Will we have losses resulting from large provisions in the third and fourth quarters? No,' said a Citicorp spokesman. 'No dividend cut is planned.'" Complaint ¶ 25. On September 24, 1990, *The Wall Street Journal* quoted Michael A. Callen, an executive in charge of Citibank's wholesale banking division, as saying "no one around here is talking about a dividend cut" and that "I don't think we will have change in the pattern of reserving and write-offs that's in place; I think we've got a hold on it." Complaint ¶ 26. On September 25, 1990, the *American Banker* similarly reported that "a spokesman for Citicorp said 'there's been no talk about a dividend cut.'" Complaint ¶ 27.

On October 16, 1990, Citicorp announced that its profits for the third quarter of 1990 had fallen 38% from the level reported in the third quarter of 1989 and 10% from the level reported in the second quarter of 1990 to $221 million. Complaint ¶ 28. On October 23, 1990, *The Wall Street Journal,* in an article discussing a meeting between Citicorp executives and securities analysts, reported that:

"with pens poised on note pads, more than 150 analysts hung on every word Citicorp's Chief Financial Officer Thomas Jones had to say about problem loans, dividends and earnings last Wednesday ... Mr. Jones appeared Wednesday to be measuring his words carefully when he said 'I personally doubt' Citicorp would cut its dividend. After the meeting, he also responded to rumors about layoffs in the consumer banking sector, which has 72,000 employees. He said the number of employees there is likely to remain 'stable to slightly down. I can assure you that there are not going to be a lot of firings'."

Complaint ¶ 29 (ellipses in complaint).

On December 7, 1990, *The Wall Street Journal* reported that at a Goldman, Sachs & Co. banking conference, Reed

"confirmed that the nation's largest banking company is seeking to raise new capital through a private placement. Mr. Reed didn't specify the amount or type of the hoped-for private placement, but argued that any resulting dilution for current shareholders would be preferable to a dividend cut on common shares. According to a report yesterday by Goldman Sachs, Mr. Reed told the conference that he believes cutting dividends is a 'highly inefficient' means of raising capital."

Complaint ¶ 30. *The Wall Street Journal* also reported that a "Citicorp spokesman said the Goldman Sachs report is 'a generally accurate reflection' of Mr. Reed's remarks." Complaint ¶ 31.

On December 18, 1990, in what the complaint describes as a "stunning about-face," Citicorp announced that:

(a) the bank would increase its reserve for troubled loans by $340 million;

(b) it would cut its staff by 8,000 employees and take a fourth quarter charge of nearly $300 million to cover costs related to these terminations;

(c) as a result of the increase in loan loss reserves and the anticipated employee terminations, the bank expected to post a fourth-quarter loss of $300–400 million;

(d) management recommended that the Company slash its annual dividend by 44% from $1.78 to $1.00 per share.

Complaint ¶ 32.

Plaintiff filed this suit two days later. The complaint alleges both that the price of Citicorp stock immediately declined "in response" to the December 18 announcement and that the announcement had been "timed to coincide" with the Federal Reserve Bank's statement that it would lower the discount rate—"a move which is anticipated to have a positive affect [*sic*] on the price of bank stocks." Complaint ¶ 33.

The complaint then quotes an article in *The New York Times* which allegedly stated that "analysts assume the dividend cut was a result of prompting by regulators who were upset early this year when Citicorp increased its dividend, despite weak earnings" and that "[e]arlier this month Mr. Reed said reducing the dividend was an inefficient way of raising capital because the money saved was too little compared with the lower price the company would receive when it next tried to sell stock." Complaint ¶ 34 (brackets in complaint). The complaint then quotes a December 20, 1990 article in the *Financial Times* which reported that Reed "made an unusual *mae culpa* [*sic*] recently. 'We were warned about real estate two years ago, we were warned again a year ago, and we pooh-poohed it,' said the chairman of Citicorp in an interview last month. 'Now I'm damn embarrassed because the critics were right and we were wrong.'" Complaint ¶ 35 (emphasis in complaint).

The body of the complaint concludes with an allegation that "defendants knew or were reckless in not knowing, based on facts available to them, that their statements made and disseminated during the Class Period were false and misleading in that there was no reasonable basis for their statements concerning the financial condition of Citicorp, its future prospects, and its dividend." Complaint ¶ 36.

Plaintiff alleges the above events were part of a scheme to inflate the price of Citicorp stock by "falsely portray[ing] the financial condition of Citicorp[,] ... falsely project[ing] the Company's profitability and continued payment level of dividends—indeed of customary [*sic*] increasing dividends—to its shareholders in good or bad cycles and ... fail[ing] to correct prior statements and forecasts," and that defendants thereby violated § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 or aided and abetted such violations. Complaint ¶¶ 38–39. The complaint further alleges that the scheme had its intended effect of inflating the price of Citicorp stock and that the members of the purported class suffered damages as a result.

## II.

■ To state a claim under § 10(b) and Rule 10b–5, a complaint must allege detrimental reliance on a material misstatement or omission, made with intent to deceive or defraud, in connection with the purchase or sale of a security. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Luce*, 802 F.2d at 55.

■ Because these claims assert fraud, they are subject to the requirements of Fed.R.Civ.P. 9(b).[1] "Rule 9(b) is designed to further three goals: (1) providing a defendant fair notice of plaintiff's claim, to enable preparation of a defense; (2) protecting a defendant from harm to his reputation or goodwill and (3) reducing the number of strike suits." *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987). To specify fraud with particularity, plaintiffs must allege specifically the circumstances of the fraud claimed, including the content of any alleged misrepresentation, and the date, place and identity of the persons making the misrepresentations. *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990); *DiVittorio*, 822 F.2d at 1247; *Luce*, 802 F.2d at 54. Although scienter need not be alleged with great specificity, plaintiffs

---

1. Fed.R.Civ.P. 9(b) provides: "In all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally."

are required to plead facts which give rise to a strong inference of fraudulent intent. *Wexner*, 902 F.2d at 172.

Defendants assert several grounds for dismissal. First, they contend that, as a matter of law, misstatements in newspaper articles are not actionable under the securities laws unless defendants had complete control over the articles' content, relying principally on *Schwartz v. Novo Industri, A/S*, 658 F.Supp. 795, 799 (S.D.N.Y.1987) (Weinfeld, J.) (even if defendant had knowledge of facts that were contrary to optimistic predictions about future growth rate made by company President in *Wall Street Journal* article, "it would not be fair to draw an inference of fraud from a statement appearing in a news article over which defendant had less than complete control") and *Milberg v. Western Pac. R.R. Co.*, 51 F.R.D. 280, 282 (S.D.N.Y.1970) (corporations are not required to read and correct every article written about them). Plaintiff would distinguish those two cases by relying on *In re Columbia Sec. Litigation*, 747 F.Supp. 237, 245 (S.D.N.Y.1990) where Judge Sand held that a misstatement of present fact to a reporter—*i.e.* that merger negotiations were not taking place when in fact they were—which then appeared in a *Forbes* magazine article, was not considered a prediction, and was therefore actionable under the securities laws.

Although *Columbia* correctly holds that fraudulent misstatements will not be immunized from liability merely because they happen to have been disseminated through foreseeable press reports, that commonplace proposition does not help this plaintiff. The "facts" alleged in the complaint—mainly the contents of selected newspaper articles in several different publications over a 9–month period—fail to state a claim against defendants and fail to plead securities fraud with particularity.

■ For starters, reading the complaint "with great generosity," as I must on a motion to dismiss, *Yoder v. Orthomolecular Nutrition Institute, Inc.*, 751 F.2d 555, 562 (2d Cir.1985) (Friendly, J.), certain of the press reports cited by plaintiff are not attributed to any of the defendants, nor could they reasonably be inferred to have originated with defendants. Rather, they represent the reporters' independent editorial commentary and accordingly can not provide the basis for a claim that *defendants* made fraudulent misrepresentations. *Milberg*, 51 F.R.D. at 282.

Thus, the views attributed to analyst Richard Bove of Dean Witter, who allegedly stated, in response to Reed's March, 1990 announcement of a dividend increase, that "regulators wouldn't let them increase [dividends] if they were in big trouble" and that he (Bove) was particularly encouraged by the planned increase (Complaint ¶ 19), are irrelevant to the issue of whether defendants' conduct was part of a fraudulent scheme to misrepresent the bank's condition. Similarly, the various interpretations—by outsiders—of Citicorp's decision to raise the dividend: that "the bank company's weak earning report didn't seem to phase the Citicorp directors," contained in the April 18, 1990 edition of *USA Today* (Complaint ¶ 21), that the company was "signalling that [it] expects its operations to remain healthy," contained in the April 18, 1990 edition of *The Wall Street Journal* (Complaint ¶ 22), and that Reed "takes a damn-the-torpedoes attitude," contained in the June 21, 1990 edition of *The Wall Street Journal* (Complaint ¶ 23), are not reasonably attributable to defendants and accordingly do not give rise to liability under the federal securities laws. The complaint must rise or fall on allegations about defendants' conduct and not on wide-eyed citation to the gratuitous commentary of outsiders. Such commentary is irrelevant to plaintiff's claims.

■ With respect to *The New York Times* report that "analysts assume the [December 18] dividend cut was the result of prompting by regulators who were upset early this year when Citicorp increased its dividend, despite weak earnings" (Complaint ¶ 34), analysts' opinions are neither relevant to this complaint nor admissible, and, even if the "analysts' assum[ptions]" are true, that can not reasonably lead to an inference that defendants made intentional or reckless misrepresentations to the public

**1256**

at an earlier time. If anything, the cited report suggests the opposite: that defendants honestly believed a dividend cut was an inefficient way of raising capital, and that the subsequent requests of some unnamed regulators, rather than the collapse of defendants' alleged scheme, was what prompted the December 18 dividend cut. Other than quoting a newspaper article's reference to what unnamed analysts' "assume" about the opinions of unnamed "regulators," the complaint contains no factual allegation that specific regulators issued a specific warning on dividend policy to Citicorp in advance of the bank's decisions to increase dividends or in advance of any purported misstatements by either of the individual defendants.

■ Other articles referred to in the complaint are not attributable to defendants with the degree of particularity required by Rule 9(b). For example, plaintiff quotes an article discussing possible dividend cuts by major corporations, contained in the September 22, 1990 edition of *The Dallas Morning News*, as follows: "Citicorp, the nation's largest banking group, said it was in no such trouble. 'Will we have losses resulting from large provisions in the third and fourth quarters? No,' said a Citicorp spokesman. 'No dividend cut is planned.'" Complaint ¶ 25. Similarly, plaintiff quotes the September 25, 1990 edition of the *American Banker* as reporting "a spokesman for Citicorp said 'there's been no talk about a dividend cut.'" Complaint ¶ 27. It goes without saying that defendant is entitled, under Rule 9(b), to know who made these allegedly fraudulent remarks, when they were made, and where they were made. *DiVittorio*, 822 F.2d at 1247. The complaint's attribution of newspaper reports to a "Citicorp spokesman" utterly fails to meet this burden.

■ The remaining articles, or parts thereof, which are attributed to specific defendants contain statements of opinion and not, as plaintiff claims a reasonable person should infer, intentional misrepresentations about Citicorp's financial condition or a guarantee that the bank would not lower its dividend. Statements about future events that are plainly expressions of opinion and not guarantees are not actionable under the federal securities laws. *Friedman v. Mohasco Corp.*, 929 F.2d 77, 79 (2d Cir.1991) (complaint fails to state cause of action "by alleging that defendants represented that securities would, in the opinion of financial advisors, have a specified market value and that the securities, when issued, did not attain the hoped for value.").

Thus, the statement attributed to Michael A. Callen, a Citicorp executive not named as a defendant, in the September 24, 1990 edition of *The Wall Street Journal:* "I don't *think* we will have change in the pattern of reserving and write-offs that's in place; I *think* we've got a hold on it" (Complaint ¶ 26) (emphasis added), the report on defendant Jones' statements to a meeting of securities analysts, contained in the October 22, 1990 edition of *The Wall Street Journal* to the effect that he *"personally doubt[ed]* Citicorp would cut its dividend" (Complaint ¶ 29) (emphasis added), and the report, in the December 7, 1990 edition of *The Wall Street Journal*, that Reed *"argued* that any resulting dilution for current shareholders [from the issuance of new shares] would be *preferable* to a dividend cut on common shares" and that *"he believes* cutting dividends is a 'highly inefficient' means of raising capital" (Complaint ¶ 30) (emphasis added), are all expressions of those speakers' opinions and can not reasonably be read to guarantee future events. Although defendants can not immunize themselves from liability under the securities laws simply by adding to their statements such subjective words as "I think," "I doubt," and "I predict," it is apparent from the context, as described in the complaint, that defendants were simply expressing their views about anticipated events. *Cf. Friedman*, 929 F.2d at 79 (although plaintiff's complaint underlined that portion of defendants' allegedly fraudulent statements containing the words "will have," such "highlighting does not alter the fact that the documents expressed no guarantee" of the security's future market value). Significantly, there is no fact alleged in the complaint to suggest that de-

fendants did not actually hold the views they expressed.

Defendants have submitted both excerpts from the transcript of Jones' full remarks to analysts and a full copy of the Goldman Sachs report of Reed's remarks to that firm's banking conference. Only portions of these documents were reported in the October 22 and December 7, 1990 editions of *The Wall Street Journal,* respectively, and only those newspaper reports were included in the complaint. Were this a motion for summary judgment, I might well hold, as a matter of law, that defendants are not responsible for a newspaper's misleading editing of their statements. *Milberg,* 51 F.R.D. at 282. However, because I may not go outside the pleadings without formally converting defendants' motion to dismiss into one for summary judgment and allowing plaintiff an opportunity to submit additional evidence in opposition and possibly to conduct discovery, I have disregarded these submissions. Fed. R.Civ.P. 12(b); *Kopec v. Coughlin,* 922 F.2d 152, 155–56 (2d Cir.1991). Nonetheless, the defendants' statements, even as selectively excerpted by newspapers and, in turn, even more selectively excerpted in the complaint, are not actionable under the securities laws. The quoted remarks of Callen and Jones are their individual predictions, specified as such, which, in 20–20 hindsight, turned out wrong. With respect to Reed's remark that cutting dividends was a "highly inefficient" means of raising capital, no reasonable person could treat that debatable proposition as any sort of guarantee that the Citicorp Board of Directors would not later decide to cut the bank's dividend.

Based on later events—specifically, what plaintiff characterizes as Citicorp's "stunning about-face" announcement, two days before he filed his complaint, of a dividend cut, layoffs, and an increase in loan loss-reserves—plaintiff asserts that it may be inferred defendants actually did not hold their expressed opinions or that they failed to convey caution where they "knew caution was warranted." *Goldman v. Belden,* 754 F.2d 1059, 1068–69 (2d Cir.1985); *see also Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 164 (2d Cir.1980) ("Liability may follow where management intentionally fosters a mistaken belief concerning a material fact such as its evaluation of the company's progress and earnings prospects in the current year.").

Plaintiff fails, however, to allege any facts that lead to this inference. In *Goldman,* "detailed in the Complaint" were allegations that defendants' optimistic sales predictions were belied by their actual knowledge of contradictory facts. 754 F.2d at 1068–69 (emphasis added). Here, plaintiff has failed to " 'allege particular facts demonstrating the knowledge of defendants at the time that such statements were false,' " *DiVittorio,* 822 F.2d at 1248 (*quoting Luce,* 802 F.2d at 57), nor has he set forth any facts, as opposed to conclusory allegations, to show that defendants' opinions and projections were issued "without reasonable genuine belief." *Herskowitz v. Nutri/System, Inc.,* 857 F.2d 179, 184 (3d Cir.1988).

The complaint as a whole alleges simply that defendants' optimism about Citicorp's prospects turned out wrong. Missing are any facts or identified circumstances that would generate an inference of guilty knowledge. Although " 'great specificity [is] not required with respect to . . . allegations of . . . scienter,' " *Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987) (quoting *Goldman,* 754 F.2d at 1070) (brackets in original) (ellipses in original), "[t]his does not mean . . . that plaintiffs are relieved of their burden of pleading circumstances that provide at least a minimal basis for their conclusory allegations of scienter." *Fluor,* 808 F.2d at 962.

In order adequately to plead scienter, plaintiff must either demonstrate the existence of *"facts* showing a motive for committing fraud and a clear opportunity for doing so," or, where a motive is not apparent, identify *"circumstances indicating conscious behavior by the defendant . . .,* though the strength of the circumstantial allegations must be correspondingly greater." *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987) (emphasis added), *cert. denied,* 484 U.S.

1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). In this case, plaintiff alleges simply that defendants' motive was to "inflate the market price of Citicorp common stock." Complaint ¶ 38. However, the complaint provides no facts to support that allegation. For example, there is no claim that individual defendants maintained the stock price at inflated levels in order to sell a substantial block of their own stock. *E.g. Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. 962, 977 (E.D.N.Y.1988).

Similarly, the complaint fails to identify any circumstances which "give rise to a *strong* inference that defendants had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *Fluor*, 808 F.2d at 962 (emphasis added). Plaintiff alleges that defendants "knew or were reckless in not knowing, based on facts available to them, that their statements made and disseminated during the Class Period were false and misleading in that there was no reasonable basis for their statements concerning the financial condition of Citicorp, its future prospects, and its dividend." Complaint ¶ 36. However, plaintiff fails to allege which specific "facts" were "available to them," whoever "them" may have been, and why those unstated facts lead to the strong inference that "there was no reasonable basis for the statements."

Plaintiff makes much of a report in the December 20, 1990 issue of the *Financial Times* quoting Reed as saying, in an interview published a month earlier in another publication: "We were warned about real estate two years ago, we were warned again a year ago, and we pooh-poohed it … Now I'm damn embarrassed because the critics were right and we were wrong." Complaint ¶ 35. That statement refers only to the bank's real estate loan portfolio and says nothing about purported warnings regarding Citicorp's dividend policy— the main issue here—nor does it indicate who made the warnings or the contents of the warnings. Plaintiff provides no specifics with respect to even one of what his memorandum of law describes as "all the warnings and danger signals." Plaintiff's Memorandum of Law at 13. Without these

bare facts, there can be no inference of intentional or reckless misconduct by any of the defendants. In a fiercely competitive industry covered by hundreds of financial analysts and regulated by various national and state agencies, the unsurprising allegation that there existed "critics" of Citicorp's policies fails to meet the standards of Fed.R.Civ.P. 9(b). To the extent Reed admits that, as Chairman of the largest bank in the United States (Complaint ¶ 7), he himself had numerous critics, that is insufficient to support the inference that he did not honestly believe his expressed opinion that dividend cuts were highly inefficient, or that his raising of dividends was part of a scheme to inflate the price of Citicorp stock. For the foregoing reasons, plaintiff's complaint fails to set forth scienter adequately.

Finally, plaintiff's suggestion that Reed had "admitted defendants' recklessness," Plaintiff's Memorandum of Law at 23, is sheer buncombe. Section 10(b) of the Securities Exchange Act is not a strict liability statute. Reed's so-called "mae culpa" [*sic*] (in the words of the *Financial Times*, as misquoted in the complaint) that he was "embarrassed because the critics were right and we were wrong" yields only the inference that he and other employees of Citicorp admitted to being human. It would not lead a reasonable person to conclude that defendants committed securities fraud. The securities laws do not put executives of public corporations to the choice of either hiding their mistakes or facing a class-action shareholder suit. In fact, the "fundamental purpose" of the securities laws is just the opposite—"to substitute a philosophy of full disclosure for the policy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963). *See also Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 982–83, 99 L.Ed.2d 194 (1988). Reed's admission that he erred is irrelevant to whether defendants previously had committed securities fraud and adds nothing to plaintiff's other non-specific allegations clipped from the newspaper.

Judge Friendly described a strikingly similar claim—against a different major New York bank, during an earlier banking crisis, for failing to show "greater clairvoyance"—as nothing more than "an example of alleging fraud by hindsight." *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978). A complaint must contain "more than vague allegations that, as shown by subsequent developments, the corporation's true financial picture was not so bright in some respects as ... painted and that the defendants knew, or were reckless in failing to know, this." *Id.*

Plaintiffs have stitched together a patchwork of newspaper clippings and proclaimed the result a tale of securities fraud. But by even the modest standards of Rules 9(b) and 12(b)(6), it isn't. Read as a whole, the complaint creates the strong impression that when Citicorp announced a cut in dividends, plaintiff's counsel simply stepped to the nearest computer console, conducted a global Nexis search, pressed the "Print" button, and filed the product as their complaint. Accordingly, defendants' motion to dismiss for failure to plead fraud with particularity and for failure to state a claim is granted. Plaintiff will have one opportunity to amend the complaint. However, if an amended complaint simply adds additional clippings or edits existing scraps, I will invite a motion for Rule 11 sanctions.

SO ORDERED.