## In re TIME WARNER INC. SECURITIES LITIGATION.

This document relates to: all actions

No. 91 Civ. 4081 (MEL).

United States District Court, S.D. New York.

May 29, 1992.

Milberg Weiss Bershad Specthrie & Lerach (David J. Bershad, Sol Schreiber, Deborah Clark–Weintraub, of counsel), New York City, Much Shelist Freed Denenberg & Ament, P.C. (Michael J. Freed, Joseph D. Ament, Ellyn M. Lansing, of counsel), Chicago, Ill., and Kaufman Malchman Kaufmann & Kirby (Roger W. Kirby, of counsel), New York City, for plaintiffs.

Paul, Weiss, Rifkind, Wharton & Garrison (Stuart Robinowitz, Arthur L. Liman,

Alisa D. Shudofsky, Jonathan J. Freedman, Michael E. Gertzman, Isaac D. Corre, Matthew L. Levine, of counsel), New York City, for defendants.

LASKER, District Judge.

In this suit alleging securities fraud, common law fraud, and negligent misrepresentation, the defendants, Time Warner Inc. and four individual officers of the company,[1] move to dismiss the amended class action complaint[2] under Rules 9(b) and 12(b)(6), Fed.R.Civ.P., on the grounds that plaintiffs have alleged neither material misstatements nor material omissions and that the complaint does not allege scienter on the part of the defendants.

The motion is granted.

## I.

The events giving rise to the complaint followed the celebrated, or notorious, creation of Time Warner through the former Time, Inc.'s 1989 leveraged buyout of the former Warner Communications, Inc., which was consummated to defeat a competing $200 per share tender offer for Time from Paramount Communications, Inc., and which imposed a heavy debt load on Time Warner. Despite Time's and Warner's representations before the merger that shares of the combined company would have a value over $200, stock prices fell substantially below that level following the merger.

Against this background, the complaint alleges, Time Warner and the individual defendants misled purchasers of its stock during the asserted class period of December 12, 1990 through June 7, 1991 by falsely claiming that the company was undervalued and that the intrinsic value of its shares was far higher than the market reflected, particularly because, the company claimed, it was negotiating "strategic alliances" in which foreign businesses would acquire minority shares in Time Warner subsidiaries, and thereby would provide Time Warner with needed capital and enhanced global prospects. The complaint alleges that these claims were false and were inconsistent with the defendants' knowledge, which they fraudulently omitted to reveal, that the strategic alliances were unlikely to occur and that the company was considering an additional stock offering that it knew was inevitable and would further dilute the value of existing Time Warner shares. Compl. ¶ 95. The alleged motivation for this misleading behavior was defendants' desire "to maintain the impression that Time Warner was well positioned to achieve the generous share value which they had represented would be recognized following the merger of Time and Warner," Compl. ¶ 22, and their desire "to dispel the public perception created by the Company's continuing losses and enormous debt load that the merger injured the Company." *Id.*

During the class period, Time Warner did not mention the possibility of a new stock offering. Nevertheless, rumors of such an offering circulated on June 5, 1991, and Time Warner stock fell $6.25 to a closing price of $110.75 per share. On June 6 Time Warner announced its intention to make a variable-price stock offering of approximately 34.5 million shares to add to the 57.8 million then-existing shares. Time Warner stock closed on June 6 at $99.50 per share. On June 7 it closed at $94.625. When it became apparent that this initial plan would not succeed, Time Warner on July 12, 1991 announced a fixed-price offering. The July 12 closing price was $89.75 per share.

According to plaintiffs, "Defendants' concession that they could not achieve such strategic alliances and their implementation of a dilutive rights offering which have diminished the value of Time Warner stock

---

**1.** The individual defendants are Steven J. Ross (Time Warner Chairman and co-Chief Executive during the class period), N.J. Nicholas (President and co-Chief Executive during the class period), Gerald M. Levin (Vice Chairman and Director during the class period), and Bert W. Wasserman (Director, Executive Vice President and Chief Financial Officer during the class period).

**2.** A motion for class certification has been filed but not ruled on pending determination of this motion to dismiss.

have defeated the expectations of Time Warner investors who had purchased the stock in reliance on management assurances that the entertainment giant created by the merger would generate synergies and attract outside investment capital at levels which would justify and validate the pivotal decisions undertaken by the Time directors in rejecting the $200 per share Paramount offer." Compl. ¶ 22. Time Warner's repeated indication during the class period that it was pursuing strategic alliances, coupled with its failure to disclose its consideration of a possible rights offering and the continuing difficulties attracting partners who could relieve its heavy debt, is alleged to have inflated the price of Time Warner stock artificially, with the result that investors who purchased shares during the class period were injured by the inevitable decline in the stock's price that ensued.

The complaint objects to several categories of statements, maintaining that they were materially misleading and that they rendered Time Warner's failure to reveal information concerning a possible stock offering materially misleading: first, statements by individual defendants that were quoted in the popular media or were released by Time Warner, and that are quoted in the complaint; second, unattributed statements quoted in the media and attributed to "Time Warner officials," that also are quoted in the complaint; third, unspecified but allegedly frequent informal contacts with persons who are not specifically identified in the complaint but are alleged to be influential Wall Street figures. Of the last category it is said that the statements were part of a Time Warner scheme to "provide[ ] information to securities analysts and others in order to promote the Company and purportedly inform the investment community of the current status and near and long-term prospects of the Company," Compl. ¶ 6, in support of Time Warner's efforts to gain market credibility. As evidence of Time Warner's attempt to influence the market in this way, the complaint cites analysts' reports and recommendations and media reports that suggest

that Time Warner officials provided information underlying the reports.

## A. Statements by Time Warner or Individual Defendants

The complaint recites statements made directly by the company or the individual defendants both before and during the class period, which, it alleges, created false expectations of imminent strategic alliances that would improve the company's outlook and stock price, and which even if true at one time gave rise to an ongoing duty on the part of Time Warner to inform investors if and when those expectations were unjustified.

Defendant Gerald Levin was quoted in the February 7, 1990 *Wall Street Journal* (ten months before the class period) as saying:

> The combination of Warner and Time, Inc. assets is proving to be a very sturdy and growth-oriented set of businesses. This company is worth a hell of a lot more than $200.00 a share. It was then. It is now. Given the expansion opportunities, particularly in terms of geography and technology, the company would have been undersold, and that's truer today than it was last spring.

Compl. ¶ 41.

On November 30, 1990 (still before the beginning of the class period), the Wall Street Journal reported that defendant Steven Ross stated that Time Warner "continues to have serious talks that could lead to the sale of five or six separate minority stakes in its entertainment subsidiaries next year [1991] ... we want strategic alliances with partners thinking the same way we are." Compl. ¶ 50. The *Wall Street Journal* also reported, on a date unspecified in the complaint, that Ross stated in November 1990, "There may be four big industrial partners with one in Europe and two in Japan, or two in Europe and two in Japan...." Compl. ¶ 51. And on December 3, 1990, Time Warner issued a press release stating that it had "received and continued to receive many expressions of interest in forming joint ventures all over the world." Compl. ¶ 52.

Plaintiffs also complain of a number of statements during the class period. The company's 1990 10–K Statement filed with the Securities Exchange Commission (SEC) reported: "Management of Time Warner also has had discussions with potential partners on the mutual advantages of strategic alliances formed at the subsidiary level." Compl. ¶ 56. In the 1990 Annual Report, Ross and defendant N.J. Nicholas similarly claimed to be "excited by the possibilities for growth that will increase shareholder value, especially through strategic partnerships that open opportunities no single company could realize on its own.... Time Warner has spent a good deal of the past year discussing with potential partners the mutual advantages we can derive from well-planned and strategically-executed alliances at the subsidiary level." Compl. ¶ 57.

On March 7, 1991, Ross stated that the "company was in talks with possible buyers of stakes in some of its entertainment businesses," while on March 15 Nicholas said the company was "continuing talks with potential foreign partners," and added, "We're not selling or buying. We're partnering." Compl. ¶ 63. On April 11, Ross addressed an entertainment industry conference and stressed the need for entertainment corporations to develop "strategic alliances" "to provide access to new products or the markets that would otherwise be closed or difficult to penetrate." Compl. ¶ 64.

The May 13, 1991 issue of Business Week quoted Ross as saying that Time Warner was "currently engaged in nearly two dozen discussions in Europe and Asia that could link most of the world's entertainment and media companies in a complex web of relationships." Ross further stated in the same interview, "Our objective is to build global partnerships.... We are making alliances at the subsidiary level with the partners keeping their national identities and bringing their respective strengths to bear." Compl. ¶ 66.

### B. Statements Attributed to Unnamed Time Warner Sources

An unnamed Time Warner spokesman said on February 15, 1991 that the compa-ny had "said all along that we are interested in the concept of international partnership, and we have been talking with many interested parties.... Now we are in the process of selecting from among them those that share our vision." Compl. ¶ 59. On February 20, the complaint alleges, "Time Warner stated" that it was still negotiating strategic alliances with "a significant number of parties." Compl. ¶ 60.

On April 19, 1991, an unidentified Time Warner spokesman stated that talks regarding possible mergers with Time Warner subsidiaries had "intensified." Compl. ¶ 65.

Finally, a Time Warner spokesman on June 5, 1991 "refused to comment" on rumors that Time Warner was contemplating a stock offering, and stated that the "company has been saying and continues to say that discussions to form partnerships are ongoing." Compl. ¶ 72. Time Warner announced its new offering the next day.

### C. Analysts' and Media Reports Allegedly Influenced by Time Warner Informal Contacts

The complaint recites a number of media reports and market analysts' recommendations which, it maintains, support an inference that Time Warner informally disseminated sham "information" as to its prospects in an attempt to enhance the shares of its stock.

For example, on October 23, 1990 (before the class period), Merrill Lynch issued an analyst's report recommending the purchase of Time Warner stock because Time Warner "indicated that it has had serious negotiations concerning the sale of an interest in some of its cable systems ... and continues to explore joint ventures with Japanese, European, and U.S. companies which would help Time Warner reduce its debt." Compl. ¶ 44. The same day, the *Wall Street Journal* reported that the company was "seeking partners proffering new cash to whittle its debt." Compl. ¶ 45. Morgan Stanley and Smith Barney issued similar reports and "buy" recommenda-

tions in late October, each of which stressed the potential of "strategic alliances" or a "restructuring involving joint venture partners" to enable Time Warner to reduce its debt load. Compl. ¶¶ 46, 47.

On November 27, 1990, still before the class period, Shearson Lehman issued a positive analyst's report that similarly stressed the potential benefits, including debt reduction, of strategic alliances believed to be under negotiation. The report stated, "Management has said that those negotiations involve the potential sale of minority equity interests in Time Warner assets." Compl. ¶ 49.

On December 12, 1990, at the beginning of the class period, the *Wall Street Journal* reported that Time Warner was engaged in "serious talks" toward strategic alliances. Compl. ¶ 54. On February 13, 1991, the *Journal* reported that Time Warner appeared to be closer to completing "a strategic alliance with one or more partners that would bring cash into the company while opening new world markets to Time Warner." The same story reported that Ross and Nicholas had "been globetrotting since last year talking to potential partners." Compl. ¶ 58.

Several similar analysts' statements were issued in February 1991. On February 13, for example, Donaldson Lufkin & Jenrette Securities Corp. issued a "buy" rating on Time Warner, stating, "We are recommending purchase of Time Warner because the shares are selling at a 54% discount to the underlying value of the company's assets, and we assign a high probability to a restructuring within a year that would close that discount." Compl. ¶ 69(i). Two days later Wertheim Schroeder issued a similar recommendation, noting, "We continue to expect an asset sale, joint venture or other major restructuring some time this year." Compl. ¶ 69(ii). On February 20, Wertheim Schroeder, in a report which referred to a meeting with Time Warner management, reported further that Time Warner "continues to be in discussion with 'a significant number of parties' regarding strategic alliances. Working aggressively, [Time Warner] expects to complete a deal in 1991." Compl. ¶ 69(iii). On February 25, Kidder, Peabody also strongly recommended Time Warner stock, noting that Time Warner management had reiterated that it had "significant conversations with a variety of interested parties to pursue possible strategic alliances." Compl. ¶ 69(iv). Similar reports were issued by different brokerages during March and April, culminating in an April 19, 1991 report by Wertheim Schroeder that discussions had intensified since February, and that there should be some definitive announcement by year-end. Compl. ¶ 69(ix).

The May 13, 1991 Business Week article that included statements by Ross also opined as to the possible effects of successful strategic alliances for Time Warner, stating that by "bringing in billions of dollars in new equity, Time Warner would make Wall Street happy and help ratchet Time Warner stock up...." Compl. ¶ 67. Apparently from the same article, the complaint contains the quotation, " 'The talks are like an auction with all kinds of assets being offered up,' stated one European reportedly involved in one set of negotiations. 'Nothing is off-limits to Time Warner.' " *Id.*

\*　　\*　　\*　　\*　　\*　　\*

As noted above, on June 5 an unnamed Time Warner spokesman refused to comment on rumors of a new offering and reiterated the company's public statement that "discussions to form partnerships are ongoing." Compl. ¶ 72. The next day, Time Warner announced its first proposed new stock offering, and the price of its stock plummeted.

The complaint contains standard recitals of defendants' scienter, supported by reference to the individual defendants' responsibilities for the company's significant decisions and by the strategic subject of the omissions and statements alleged. In support of their contention that Time Warner secretly was planning its offering throughout the class period, plaintiffs point to a Reuters report on June 6, 1991 that the company had been working for months on a possible offering, Compl. ¶ 81, to the apparent inability of Time Warner to achieve

an acceptable strategic alliance as an indicator of the need to raise capital through a stock offering, Compl. ¶ 84, and to the existence of a Merrill Lynch plan for a possible "equity restructuring" submitted to Time Warner on November 15, 1990. Exhibit A to letter to Court from Sol Schreiber, Esq., Jan. 2, 1992 (filed under seal; obtained through discovery while motion was pending).

## II.

Section 10(b) of the Securities Exchange Act of 1934 states that it is unlawful for any person "To use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate...." 15 U.S.C. § 78j(b) (1988). Rule 10b–5 of the Securities and Exchange Commission, promulgated to implement § 10(b), provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading,
>
> ... in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1991).

To state a viable claim under § 10(b) and Rule 10b–5, a complaint must allege that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's actions caused him injury." *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985). *See also*

*Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

Time Warner and the individual defendants argue that the complaint fails to allege statements or omissions by defendants which are or were misleading, that it inadequately alleges scienter, and that it fails to meet the pleading requirements of Rule 9(b), Fed.R.Civ.P., that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Defendants further argue that the complaint's state law claims should be dismissed, either pursuant to Rules 9(b) and 12(b)(6), Fed. R.Civ.P., or for want of pendent jurisdiction in the event the federal claims are dismissed. The defendants' presentation is persuasive.

### A. *Defendants' Material Misstatements or Omissions*

The complaint supports the proposition that Time Warner and its officials during the class period tried to drum up enthusiasm for Time Warner stock by proclaiming the advantages possible "strategic alliances" could offer the company and its would-be partners and by reporting that negotiations were underway. The sequence of events alleged in the complaint, bearing in mind the generosity with which inferences are to be drawn in plaintiffs' favor on motions to dismiss, also adequately supports the inference that Time Warner officials were considering a stock offering during the class period but did not reveal that fact or any difficulty Time Warner may have been experiencing in its strategic alliance negotiations. Nevertheless, the complaint fails to allege either material misstatements or material omissions chargeable to defendants which were subject to a duty to disclose.

Only statements attributable to the defendants, or omissions by them, can support the claims against them. For reasons discussed below, neither the alleged statements by anonymous Time Warner sources which are quoted in the complaint nor ana-

lysts' and journalists' reports allegedly based on information gleaned from Time Warner sources may be attributed to the defendants. Accordingly, the initial, and dispositive, issue is whether those statements and omissions specified in the complaint as being made by Time Warner or the individual defendants support plaintiffs' claims.

■ The quoted statements concerning Time Warner's purported negotiation of strategic alliances all indicate that negotiations were ongoing and that the defendants were enthusiastic about the possible fruits of those negotiations. Plaintiffs do not claim that such negotiations did not occur or that Time Warner conducted them in bad faith; in fact, the complaint confirms Time Warner's negotiating zeal, as it quotes an anonymous European "reportedly involved in one set of negotiations" as saying "Nothing is off-limits to Time Warner." Compl. ¶ 67. None of the attributed statements makes a specific representation as to progress toward completion of the talks or likely partners or any other false affirmative statement. Accordingly, the attributed statements concerning possible strategic alliances alleged in the complaint are not on their face misrepresentations within the meaning of § 10(b).

■ Plaintiffs contend that Time Warner's statements concerning the existence and promise of negotiations toward strategic alliances raised investor expectations and triggered a duty to reveal that the ballyhooed strategic alliances would not materialize whenever defendants had that knowledge. Plaintiffs are correct that the securities laws require that whatever statements a corporation issues be truthful and complete, and not materially misrepresent the facts existing at the time of the announcement. That duty includes the obligation "to correct prior material statements as they bec[o]me inaccurate." *In re Warner Communications Secur.*, 618 F.Supp. 735, 752 (S.D.N.Y.1985), *aff'd*, 798 F.2d 35 (2d Cir.1986). However, despite plaintiffs' unsupported assertion, the duty does not extend to requiring a defendant to reveal various strategic alternatives merely because they revealed one possible approach. Plaintiffs have not identified authority for imposing such a duty, and doing so would place an excessive burden on companies either never to comment on their plans or never to be free to evaluate alternative strategies without exposing all of their deliberations to public scrutiny.

None of defendants' statements quoted in the complaint is inconsistent with plaintiffs' contention that Time Warner in fact was encountering difficulty with its negotiations and may also have been contemplating a stock offering. The defendants' statements simply expressed their enthusiasm about ongoing negotiations and their belief that strategic alliances, if achieved, would yield improved results and lift the company's stock price dramatically. Both the absence of factual allegations showing that defendants made falsely optimistic predictions and the lack of inconsistency of subsequent events with the statements alleged distinguish this case from *Goldman v. Belden*, 754 F.2d 1059, 1068–69 (2d Cir. 1985) (failure to reveal known negative factors in conjunction with optimistic statements actionable under § 10(b)), upon which plaintiffs rely. Because in the absence of a specific duty to disclose companies are bound to reveal information only if necessary to make other statements the company did make not materially misleading, and because the statements made were not inconsistent with the omitted facts alleged in the complaint, those omissions did not violate a duty of Time Warner under the securities laws.

■ The complaint's only other relevant quotation of a defendant is from a statement by Gerald Levin, who said in an interview roughly ten months before the class period that the company was worth "a hell of a lot more than $200.00 a share." Compl. ¶ 41. Levin's statement can only be read as his somewhat hyperbolic opinion of the company's inherent worth as of February 1990, and cannot reasonably be understood to hint at his expectation of any future event that would radically alter Time Warner's stock price.

Levin's statement has not adequately been alleged to be either a material misstatement affecting these plaintiffs or an assertion giving rise to a duty to disclose inconsistent facts which may later have become known to the defendants. Because he spoke ten months before the asserted class period, Levin's statement, even if utterly false and fraudulently made, cannot have formed a basis for plaintiffs' expectations when they purchased shares ten or more months later; innumerable intervening factors could have changed the company's value since Levin spoke. Although plaintiffs are correct that a defendant in some circumstances is obliged to reveal facts which become known and which contradict earlier material assertions of fact by a defendant, in the present case any changed circumstances that may have arisen do not contradict Levin's earlier statement, and thus would not trigger a duty to disclose.

Moreover, the complaint fails to allege adequate facts in support of its claim that during the class period the defendants knew or recklessly neglected to realize that the strategic alliance negotiations would fail, and/or that a stock offering would be necessary. Although scienter may be pled generally, the complaint must nevertheless "plead the factual basis which gives rise to a 'strong inference' of fraudulent intent." *O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir.1991).

In this case no "strong inference" of fraud is induced by the facts alleged. Plaintiffs assert three bases for their allegation of scienter. The first is that the anticipated strategic alliance did not materialize and that the company issued stock, events which, according to plaintiffs, by their nature must have been anticipated long before they took place. However, it is firmly established that mere allegations of subsequent events contrary to a defendant's earlier statement or prediction does not establish that defendants knew or were

reckless not to know that their statements were false and misleading. *See, e.g., Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (financial results worse than those predicted earlier not adequate basis of fraudulent intent underlying company's earlier predications); *Friedman v. Mohasco Corp.*, 929 F.2d 77, 79 (2d Cir.1991) (in new stock issue where defendant projected stock price higher than actual price achieved, disappointing results not sufficient basis to allege scienter); *Hershfang v. Citicorp*, 767 F.Supp. 1251, 1257 (S.D.N.Y.1991) (dividend cut within weeks of public disavowal of that strategy by company officers not sufficient allegation of scienter).

Plaintiffs' second scienter claim, relying on *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), is that defendants had "a strong motive for committing fraud, and an opportunity for doing so," Plaintiffs' Br. at 17, a combination deemed sufficient by the Court of Appeals in that case. However, while Time Warner may have had an opportunity to commit fraud, it had no motive for engaging in the scheme alleged here, which could not rationally have been expected to succeed. No matter how vociferously Time Warner claimed that negotiations were going well and no matter how little it said concerning a possible stock offering, it had no unilateral ability, and no reasonable investor could believe that it did, to cause potential partners to invest in "strategic alliances." And, by plaintiffs' own theory of the case, the company would be compelled to undertake a stock offering if it was unable to attract new partners to invest substantial sums in joint ventures, regardless whether Time Warner convinced the investing public that the company's stock was worth $200 per share.[3] Accordingly, plaintiffs' "motive and opportunity" scienter allegations are fatally flawed.

---

3. Plaintiffs' theory that the alleged misrepresentations were motivated by the individual defendants' desire to preserve their "credibility" following the creation of Time Warner and their projection of high stock values is not plausible.

Defendants' credibility could hardly be enhanced by a scheme to promise new joint ventures knowing that they would not be finalized, all in the face of an allegedly inevitable stock offering.

The third basis of plaintiffs' scienter claim is the theory that, even if defendants lacked a motive to defraud, they engaged in "conscious behavior" from which an intent to defraud may fairly be inferred. *See Beck,* 820 F.2d at 50 (pleadings of such "conscious behavior" sufficient under Rule 9(b)). However, the court in *Beck* specifically noted that for this theory of scienter to be adequately pled, "the strength of the circumstantial allegations must be correspondingly greater" than allegations of motive and opportunity need be. *Id.* Here plaintiffs' circumstantial allegations consist solely of defendants' references to negotiations that in fact were ongoing and that plaintiffs maintain, without factual support, were doomed to fail at the time of the statements alleged. Aside from Time Warner's failure to conclude those negotiations successfully before it conducted its stock offering, which as discussed above does not support charges of fraudulent scienter, there are no facts alleged whatsoever tending to show conscious fraudulent behavior.

In sum, none of the defendants' own statements quoted in the complaint or their alleged omissions satisfies the pleading requirements of Rule 12(b)(6) for a § 10(b) cause of action, nor have plaintiffs sufficiently alleged defendants' scienter.

### B. Other Alleged Fraudulent Statements

The remaining allegedly actionable statements are of two types: those quoted in press reports and attributed to unnamed Time Warner sources; and generally alleged but unspecified off-the-record discussions between anonymous Time Warner sources and securities analysts and journalists.

#### 1. Quotations from unnamed Time Warner sources

Time Warner argues both that the complaint's inclusion of anonymous quotations from media reports cannot properly be attributed to it or the individual defendants, and that even if ascribed to them, the statements do not support a securities fraud claim.

There is ample case law establishing that to comply with Rule 9(b) a complaint must "specify the time, place, speaker, and content of the alleged misrepresentations." *Di Vittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2d Cir. 1987); *see also Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir.1986). Applying this rule in similar circumstances, Judge Mukasey recently held that a "defendant is entitled, under Rule 9(b), to know who made these allegedly fraudulent remarks, when they were made, and where they were made. The complaint's attribution of newspaper reports to a '[defendant's] spokesman' utterly fails to meet this burden." *Hershfang v. Citicorp,* 767 F.Supp. 1251, 1256 (S.D.N.Y.1991).

■ Plaintiffs argue that to satisfy the particularity requirements of Rule 9(b) they are not required to allege facts known solely to defendants (which is correct), and that, under *Di Vittorio* and *Luce,* they need only specify that statements were issued by the company collectively. However, those cases do not support plaintiffs' contention. Those cases depended on the fact that the assertions in question were contained in stock offering memoranda, and held that in such cases "no specific connection between fraudulent representations in the Offering Memorandum and particular defendants is necessary where, as here, defendants are insiders or affiliates participating in the offer of the securities in question." *Luce,* 802 F.2d at 55; *Di Vittorio,* 822 F.2d at 1247 (quoting *Luce*). The specificity requirements for pleading actionable statements are relaxed in the case of offering memoranda because they are documents of vital importance to any issuing company, and accordingly can be presumed to result from collaborative effort by senior officers of a defendant corporation. The statements in question here, by contrast, were alleged to have been uttered by unnamed spokespersons or even more shadowy figures who are not shown to have been known to defendants, and who, from the pleadings, cannot be said to have been within the defendants' control when they made the alleged state-

ments. The complaint thus fails to present an adequate factual link between the statements and the defendants.

■ Moreover, the anonymous statements, even if attributed to defendants, are not actionable. The complaint alleges only a few such anonymous statements, including a spokesman's February 15, 1991 assertion that the company had been discussing strategic alliances with many potential international partners and that "Now we are in the process of selecting from among those that share our vision," Compl. ¶ 59; a statement by "Time Warner" that it was still negotiating strategic alliances with "a significant number of parties," Compl. ¶ 60; and an April 19, 1991 statement by an unidentified spokesman that talks regarding strategic alliances had "intensified." Compl. ¶ 65. In addition, the complaint alleges that in response to rumors of an impending offering the day before it made its announcement, a Time Warner spokesman refused to comment on the possibility of an offering and reiterated the company's pursuit of strategic alliances.

Most of the unattributed statements are as innocuous as those discussed above, merely noting Time Warner's enthusiastic pursuit of its strategic alliance strategy. The mere description of negotiations as having "intensified" does not amount to a claim by Time Warner that success was near, or that an agreement would solve the company's well-known debt burden. And the company's mere refusal to comment on market rumors the day before its stock offering is not actionable because plaintiffs have failed to allege facts tying those rumors to defendants and because "[a] company has no duty to correct or verify rumors in the marketplace unless those rumors can be attributed to the company." *State Teachers Retirement Board v. Fluor Corp.*, 654 F.2d 843, 850 (2d Cir. 1981).

It is true that the February 15 statement that Time Warner was "in the process of selecting from among those that share our vision" can be read to imply that Time Warner had received firm offers and would soon announce a strategic alliance of the

sort it had described. As discussed above, however, the mere allegation of a prediction of future positive developments (such as the suggestion of likely culmination of negotiations), coupled with a later failure to achieve the promised results, is not actionable. *See Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978); *see also Hershfang v. Citicorp*, 767 F.Supp. 1251, 1257 (S.D.N.Y.1991).

Plaintiffs attempt to distinguish this case from the *Denny* line of cases, which concern representations of expected future events, by arguing that the complaint here alleges misrepresentations of facts existing at the time of the statements, namely the status of Time Warner's negotiations toward strategic alliances, which was a fact material to investors at that time. Even accepting this characterization, however, the argument fails.

First, for the same reasons identified in the discussion above of defendants' scienter as to representations chargeable to them, plaintiffs have not adequately alleged defendants' knowledge or reckless neglect of the statement's falseness at the time it was made.

■ In addition, the statement in question was so oblique that no reasonable investor could rely on it and, as a result, have been injured. No reasonable investor could conclude, based solely on the information that Time Warner had received unspecified offers and was attempting to finalize agreement on at least one of them, that Time. Warner would soon obtain a partner to serve as a *deus ex machina* to ease its financial burdens. Because, according to the complaint, Time Warner stock was inflated by the company's false promise of these two results, and because the company's failure to find a sufficiently lucrative strategic partner and its announcement of a new stock offering allegedly precipitated the rapid decline in its stock's value that injured plaintiffs, the possibility of such reliance is a necessary element of the fraud alleged by plaintiffs.

Finally, while plaintiffs may be protected by the usual rule that those facts known solely to defendants need not be pled with

specificity, their position is weakened by their failure to allege any facts, other than the subsequent failure to conclude the negotiations, to support their claim that the comment as to the negotiations' status was false.

Even factoring the unattributed quotations into the complaint's allegations, then, the complaint still alleges no more than the company's enthusiastic statements about ongoing negotiations and its silence concerning a stock offering, followed by a sudden and surprising announcement of a stock offering with no realization of the hoped-for strategic alliances. These actions do not violate the securities laws.

2. "Off the record" dissemination of false information

The last asserted basis for plaintiffs' allegations of fraud is a collection of reports and recommendations by market analysts and journalists, all of which allegedly drew on background information disseminated by Time Warner in an attempt to shore up its stock price. As with the anonymous statements quoted in various sources and in the complaint, Time Warner argues both that these statements cannot be attributed to the defendants and that, at any rate, they fail to state a claim. Both points are well taken.

■ First, the allegation of unspecified "disinformation" being spread by unnamed persons supposedly involved with Time Warner utterly fails to "specify the time, place, speaker, and content of the alleged misrepresentations," as is required by Rule 9(b) and *Di Vittorio*, 822 F.2d at 1247. *See also Schwartz v. Novo Industri, A/S*, 658 F.Supp. 795, 799 (S.D.N.Y.1987) (not "fair" to infer fraud "from a statement appearing in a news article over which defendant had less than complete control").

■ Moreover, review of the various reports and analyses from which plaintiffs derive their conclusion that Time Warner was planting falsely optimistic disinformation throughout the investment community does not in fact reveal actionable misstatements or omissions by Time Warner or anyone. The reports in question indicate that "serious negotiations" were ongoing and that the company "continue[d] to explore joint ventures ... which would help Time Warner reduce its debt," Compl. ¶ 44, or that "Management has said that those negotiations involve the potential sale of minority equity interests in Time Warner assets," Compl. ¶ 49, or that as of February 13, 1991 the company appeared closer to completing such a deal. Compl. ¶ 58. Similarly, various analysts recommended purchasing Time Warner stock because they believed the company would soon accomplish restructuring or alliances that would bring in needed cash and would enhance its business prospects. Compl. ¶ 69. Some of these analyses went on to speculate as to the amount of capital Time Warner's strategic alliances could bring in. Compl. ¶ 67.

As with plaintiffs' other allegations, these reports, even if entirely the result of Time Warner communications with analysts and journalists, merely state that negotiations were ongoing and offered great potential reward for Time Warner and its shareholders. Accordingly, they were neither materially misleading nor inconsistent with the omitted information alleged to have defrauded plaintiffs, and neither worked a fraud directly on plaintiffs nor triggered a duty to disclose the allegedly withheld information. As has been noted, the company's mere failure to achieve the goals it openly had been pursuing, and its subsequent adoption of plans harmful to plaintiffs, is not actionable. *See, e.g. Denny, supra*, 576 F.2d at 470; *Hershfang, supra*, 767 F.Supp. at 1257.

III.

In addition to their securities fraud claim, plaintiffs claim that the facts alleged constitute common law fraud and negligent misrepresentation under New York law. Defendants argue that the complaint insufficiently alleges violations of state law and should be dismissed on the merits, or, in the alternative, that the state claims should be dismissed for want of pendent jurisdiction in light of the dismissal of plaintiffs' federal claims.

## A. Common Law Fraud

The elements of fraud in New York are "representation of a material fact, falsity of that representation, scienter, reliance, and damages." *Freschi v. Grand Coal Venture,* 767 F.2d 1041, 1050 (2d Cir.1985), *vacated on other grounds,* 478 U.S. 1015, 106 S.Ct. 3325, 92 L.Ed.2d 731 (1986). Defendants owe plaintiffs no greater duty under New York common law than they do under § 10(b). *See Starkman v. Warner Communications, Inc.,* 671 F.Supp. 297, 308 (S.D.N.Y.1987). Accordingly, the same defects which afflict plaintiffs' § 10(b) claims doom their common law fraud claims.

## B. Negligent Misrepresentation

The ordinary rule under New York law is that a cause of action for negligent misrepresentation requires "actual privity of contract between the parties or a relationship so close as to approach that of privity." *Ossining Union Free School Dist. v. Anderson Larocca Anderson,* 541 N.Y.S.2d 335, 338, 73 N.Y.2d 417, 539 N.E.2d 91, 94 (Ct.App.1989). New York courts have acknowledged that this is a stringent requirement but nevertheless have imposed it "as a means of fixing fair, manageable bounds of liability" in an area of law where "what is objectively foreseeable injury may be vast and unbounded, wholly disproportionate to a defendant's undertaking or wrongdoing." *Id.,* 541 N.Y.S.2d at 337, 539 N.E.2d at 93. Federal courts typically have dismissed negligent misrepresentation claims brought by members of the investing public. *See In re Par Pharmaceutical, Inc. Sec. Litig.,* 733 F.Supp. 668, 686 (S.D.N.Y.1990).

Plaintiffs argue that their pleadings are sufficient under *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985), which held that privity was not required to state a negligent misrepresentation claim where:

(1) The [defendants] must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there [was] some conduct on the part of the [defendants] linking them to that party or parties, which evinces the [defendants'] understanding of that party or parties' reliance.

*Credit Alliance,* 65 N.Y.2d at 551, 493 N.Y.S.2d at 443, 483 N.E.2d at 118.

*Credit Alliance* does not save plaintiffs' claim. The non-privity cases that favor plaintiffs all involve dealings among a small number of parties known to the defendants, and whose reliance on defendant's representations was immediate and obvious. *See Credit Alliance, supra,* 493 N.Y.S.2d at 444–445, 483 N.E.2d at 119–120 (dismissing claim against accountant where existing creditor of corporation relied on financial statement prepared by defendant in extending additional credit but where defendants did not know of a particular purpose for the reports or of contact between defendant and plaintiff; allowing claim against auditor that knew securing financing from plaintiff was primary purpose of audit); *Ossining School District, supra* (allowing claim by district that had contract with architects who in reliance on report of defendant engineering consultant wrongly advised district that facility needed to be vacated). As we read those cases, members of the investing public such as the present plaintiffs enjoy no such close relationship with Time Warner or its officers and were not specifically known to defendants until this suit was filed. Accordingly, the negligent misrepresentation claim is dismissed pursuant to Rule 12(b).

## IV.

The sole remaining question as to plaintiffs' dismissed securities and common law fraud claims is whether or not plaintiffs are entitled to replead their allegations. Fed.R.Civ.P. 15(a) provides that "leave [to amend] shall be freely given when justice so requires." Ordinarily, dismissals under Rule 12(b) are with prejudice, but those under Rule 9(b) are without prejudice until plaintiffs have had the opportunity to restate their claims with great-

er particularity. *See Luce, supra,* 802 F.2d at 56; *see also Ronzani v. Sanofi S.A.,* 899 F.2d 195, 198 (2d Cir.1990). Indeed, it has been held to be an abuse of discretion for a district court to deny plaintiffs' request to replead more particularly when the complaint is dismissed pursuant to Rule 9(b), even where defendants had once repled their complaint before any responsive pleading was filed. *See Ronzani,* 899 F.2d at 198.

Here, the complaint has been dismissed for numerous overlapping reasons, many of them within the rubric of Rule 12(b)(6), some within that of Rule 9(b). Each statement or omission alleged has been found deficient in at least one respect under Rule 12(b). Accordingly, there is no doctrinal requirement that the dismissals be without prejudice.

Moreover, here several factors suggest that such leave might not be appropriate even if some small portion of the complaint were dismissed solely pursuant to Rule 9(b). Plaintiffs already have enjoyed a generous opportunity to replead, with their first complaint having been filed nearly a year ago. This is the third complaint plaintiffs have filed, and it therefore appears unlikely that they can do better. Moreover, plaintiffs have enjoyed fairly substantial although not complete discovery, and thus have had a greater than usual opportunity to develop their claims. Finally, the dismissal here goes so overwhelmingly to the merits of plaintiffs' claim, as opposed to the niceties of their pleading, that there would be little to be gained by allowing them to attempt to breathe new life into a complaint based even on any isolated allegations that may have fallen beyond the reach of Rule 12(b).

The fact that dismissals under Rule 9(b) ordinarily are without prejudice is in large part due to the desirability of allowing plaintiffs full opportunity to express potentially valid claims. If a case is dismissed for errors of wording, the policy favoring liberal pleading requirements dictates that plaintiffs receive at least one chance to state their claims more appropriately. However, because Rule 9(b) governs all allegations of fraud and of scienter, dismissals under the Rule may also occur for deficiencies more substantive than formal. In such cases the compelling reasons for allowing repleading carry less force; plaintiffs may well have pled all facts and circumstantial indications of fraud they can muster and still fall short of the mark, because the circumstances by which they claim to have been aggrieved simply do not allow an inference of fraud. This is one such case. When plaintiffs appear to have alleged all they are able, and where, as here, they have repleaded not once but twice, the ordinary presumption of plaintiffs' entitlement to replead following dismissal pursuant to Rule 9(b) is vitiated.

\* \* \* \* \* \*

The complaint is dismissed.

It is so ordered.