## In re NORTHERN TELECOM LTD. SECURITIES LITIGATION.

### No. 93 CIV. 4384(MGC).

United States District Court,
S.D. New York.

May 6, 1998.

Stephen D. Oestreich, Wolf Popper Ross Wolf & Jones, L.L.P., New York City for plaintiffs.

Stuart J. Baskin, Shearman & Sterling, New York City, for Northern Telecom Ltd., Jean C. Monty, Edward E. Lucente, Rou Merrills, Alan G. Lutz, Desmond F. Hudson, Frank A. Dunn, defendants.

Richard F. Ziegler, Cleary, Gottlieb, Steen & Hamilton, New York City, for Paul G. Stern, Martin G. Mand, defendants.

### MEMORANDUM ORDER

CEDARBAUM, District Judge.

Magistrate Judge Dolinger has recommended that defendants' motion for judgment on the pleadings be denied and that plaintiffs' motion to amend the complaint be granted in part. Defendants filed written objections to the Magistrate Judge's Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1)(C). After carefully examining defendants' objections and the pleadings, I accept the attached Report and Recommendation with respect to defendants' motion for judgment on the pleadings as well as the portion that recommends permitting the filing of an amended complaint. However, I sustain defendants' objections with respect to the new allegations of the proposed amended complaint as specified below.

Plaintiffs seek to add to the complaint the following statements that appeared in reports by independent analysts:

"Today's conference call [with Northern Telecom] was the most upbeat we

have heard for some time.... [Northern Telecom] is optimistic that gross margins will improve as the software component increases." (Proposed Third Am. Compl. ¶ 36.).

"[Although orders are down from the prior year, backlog is up which] gives investors some comfort that the second quarter should see growth. Our estimate is 40 cents versus 28 cents a year earlier. Management indicates that the second half should be much stronger than the first, as usual." (*Id.* ¶ 66.)

"Based on conversations with the company, we believe Northern will record modest top-line growth in the June quarter and could post significantly stronger results in the second half of the year." (*Id.* ¶ 73.)

"In a conversation with NorTel's management, the company reiterated the view that 1993 earnings will be heavily loaded in the second half of the fiscal year, very much following the seasonal pattern evident over 1992.... Our ongoing discussions with NorTel's management, in addition to the Regional Bell Operating Companies (RBOCs), continues to suggest a 10% earnings advance for all of 1993 is attainable leading to our target of $2.40 per share." (*Id.* ¶ 75.)

"The second quarter is likely to show only a very small gain, if any, versus 30 cents in the first quarter and 28 cents a year ago. Street consensus on the quarter is fairly broad, 25 cents—48 cents; our new guidance [32 cents] is in line with current company guidance...." (*Id.* ¶ 81.)

"We are reducing our second quarter earnings estimate to $0.30 per share from $0.40 to reflect management's comments, versus $0.28 in the second quarter of 1992." (*Id.* ¶ 83.)

■ These six separately reported statements do not constitute actionable

fraud. Some of the statements insufficiently reflect the actual statements of identifiable Northern Telecom executives, and some are based primarily on analysts' own interpretations or projections of Northern Telecom's results. Fed.R.Civ.P. 9(b); *In re Time Warner Inc. Secs. Litig.,* 9 F.3d 259, 265–66 (2d Cir.1993). In addition, many of these statements—to the extent that statements by Northern Telecom can be identified from the analyst reports—are vague expressions of optimism for the future which add little to the other allegations of the complaint. *In re International Bus. Machs. Corp. Secs. Litig.,* 163 F.3d 102, 108–09 (2d Cir.1998).

■ I also sustain defendants' objections with respect to the statements of Paul G. Stern, the former Chief Executive Officer and Chairman of the Board of Directors of Northern Telecom. The proposed amended complaint alleges that the following statements by Stern, as quoted in a Dow Jones News Service article, were materially false and misleading. "[I am not as] bullish as the rest of the world in terms of upturn in the economies, although we still expect to have a record year in 1993." "[I]f I'm wrong about the economy this year and it turns up the way economists are saying it will, then, hell, we'll be in great shape." (Proposed Third Am. Compl. ¶ 28.) These predictions are not accompanied by any specific statements of fact. They are general expressions of optimism that are too indefinite to be actionable under the securities laws. *In re International Bus. Machs. Corp. Secs. Litig.,* 163 F.3d 102, 108–09.

Moreover, Stern's statements are quoted in a news article that contains qualifying and balancing information.[1] For instance, the article reports that "Stern acknowledged that 1992 revenue from central office switching systems used by phone companies was flat." (Baskin Aff.,

---

1. The news report partially quoted in the complaint may be considered on this motion because it is "integral" to the complaint. *San*

*Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808–09 (2d Cir.1996).

Ex. I.) Thus, the "total mix of information" in the article is not a basis for a claim of securities fraud. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir.1996).

SO ORDERED.

## REPORT & RECOMMENDATION

DOLINGER, United States Magistrate Judge.

Plaintiffs in this class action securities litigation are pursuing claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a). They allege that, during the period from January 26 to July 30, 1993 they purchased shares or call options of Northern Telecom Ltd. ("Nortel"), and in doing so were misled by various statements made by or on behalf of senior management of the company concerning its business and financial health.

In 1993 the court dismissed the original complaint from the bench, but with leave to replead. Plaintiffs filed an amended complaint, and defendants moved to dismiss that version of the complaint for failure to state a claim. In support of the motion, defendants argued principally that the twenty statements itemized by plaintiffs as false or misleading either were the sort of "puffery" or generalized prediction on which no investor could reasonably rely or were simply not false or misleading when read in context. The District Court issued a Memorandum Opinion and Order on August 19, 1994, granting the defendants' motion in part. Specifically, the court ruled that fourteen of the twenty cited statements were not actionable, but it upheld the legal sufficiency of the claims pertaining to the remaining six statements.

Towards the conclusion of pretrial discovery, plaintiffs moved for leave to serve and file another amended complaint. Offered in two forms—one on plaintiff's original motion and the other in their reply papers—the proposed "Third Consolidated Amended Class Action Complaint" contains allegations of additional assertedly fraudulent or reckless statements made by or on behalf of defendants during the class period, all involving comments that are similar in nature to the statements that plaintiffs had originally targeted. The proposed pleading also includes allegations that Nortel had used improper accounting methods in publicly disclosing its financial performance for both 1992 and the first quarter of 1993 and that the effect of this accounting chicanery was to inflate earnings.

Defendants have opposed the motion to amend. Moreover, they have moved to dismiss that part of the current complaint that survived their 1994 motion to dismiss.

In substance, defendants argue that the proposed amendments would be futile because the new allegations are insufficient as a matter of law to plead a cognizable claim with respect to any of the newly cited statements. As for defendants' dismissal motion, they invite the court to revisit its 1994 decision because, they say, the Court of Appeals for the Second Circuit has modified the governing legal standards since the prior decision in this case. According to defendants, the purported new criteria reflect even greater skepticism about the type of allegations invoked by plaintiffs and demonstrate that the previously surviving statements are not actionable. Defendants also appear to argue that the prior decision was simply wrong in sustaining the claims pertaining to the six statements.

For the reasons that follow, I recommend that defendants' motion to dismiss be denied. The court's original dismissal decision is law of the case, and defendants do not demonstrate that there has been any meaningful change or refinement in circuit law that would either call into serious question the correctness of the original ruling or otherwise justify revisiting the issue on a motion addressed to the face of the pleadings. As for plaintiff's motion to

amend the complaint, we recommend that the motion be granted in part.

*ANALYSIS*

We first address defendants' motion to dismiss the current complaint and then turn to plaintiff's motion to amend the complaint.

### I. *The Motion to Dismiss*

■ Defendants' application to dismiss the balance of the current complaint is concededly an effort to reargue that portion of their 1994 motion that was denied by the District Court. (Tr. 12) [1]. Since that decision is law of the case in this litigation, defendants bear the initial burden of justifying why the court should reconsider issues that it had previously decided some years ago in this case. We conclude that defendants have failed to carry their burden in this respect.

### A. *The Law of the Case Doctrine*

■ The law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern in subsequent stages of the same case." *Sagendorf–Teal v. County of Rensselaer*, 100 F.3d 270, 277 (2d Cir.1996). *See also Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 131 (2d Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 365, 139 L.Ed.2d 284 (1997); *DiLaura v. Power Auth. of New York*, 982 F.2d 73, 76 (2d Cir.1992); *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir.1991). It is in effect a reflection of the general policy encouraging judicial economy and finality. *See, e.g., County of Suffolk v. Stone & Webster Engineering Corp.*, 106 F.3d 1112, 1117 (2d Cir.1997); *Soto–Lopez v. New York City Civil Service Comm'n*, 840 F.2d 162, 168 (2d Cir.1988).

■ This principle is mandatory for the District Court when an appellate court has ruled on a matter of law. *See, e.g., United States v. Minicone*, 994 F.2d 86, 89 (2d Cir.1993) (*quoting United States v.*

*Uccio*, 940 F.2d 753, 757 (2d Cir.1991)). *See also DiLaura*, 982 F.2d at 76; 18 James Wm. Moore, et al., Moore's Federal Practice, ¶ 134.20 at 134–44 (3rd ed.1997). It is discretionary, however, for a court that is considering whether to revisit its own decisions or the decisions of a sister court. *See, e.g., Lewis v. Whelan*, 99 F.3d 542, 545 (2d Cir.1996); *Uccio*, 940 F.2d at 758 (quoting *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)); *Scottish Air Int'l Inc. v. British Caledonian Group, PLC*, 152 F.R.D. 18, 24–25 (S.D.N.Y.1993); *Diduck v. Kaszycki & Sons Contractors, Inc.*, 737 F.Supp. 792, 796 (S.D.N.Y.1990), *aff'd in part, rev'd in part*, 974 F.2d 270 (1992). In such cases, the application of the law-of-the-case doctrine "does not limit a court's power to reconsider its own decisions prior to final judgment." *Sagendorf–Teal*, 100 F.3d at 277. *See also In re PCH Assocs.*, 949 F.2d at 592; *DiLaura*, 982 F.2d at 76–77 (citing cases); *Virgin Atlantic Airways Ltd. v. National Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir.), *cert. denied*, 506 U.S. 820, 113 S.Ct. 67, 121 L.Ed.2d 34 (1992); 18 Moore's Federal Practice, ¶ 134.21 at 134–46 to 134–47 and ¶ 134.22[1][C] at 134–50 to 134–51 (noting that rulings by different judges of the same court are not immune from re-examination).

■ The principal grounds justifying a court's reconsideration of its own prior decision include the discovery of new evidence, an intervening change of controlling law or "the need to correct a clear error or prevent manifest injustice". *Virgin Atlantic Airways, Ltd.*, 956 F.2d at 1255. *See also Doctor's Assocs., Inc.*, 107 F.3d at 131. In this case defendants argue principally that since the August 1994 decision, there has been a change in legal standards governing the legal adequacy of allegations of securities fraud that target optimistic public statements of corporate representatives. They suggest that the purported new decisional authority justifies setting

---

1. "Tr." refers to the transcript of the July 17, 1996 oral arguments.

aside the court's initial decision on the six challenged statements. Alternatively, if perhaps less diplomatically, they might be understood to be arguing, in substance, that even if the law remains the same, this court's prior decision was so wrongheaded as to constitute "clear error." *Virgin Atlantic Airways, Ltd.*, 956 F.2d at 1255.[2]

### B. *The Claimed Change in the Law Since 1994*

On its face, defendants' argument rests principally on the contention that the Second Circuit's decision in *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris, Cos. Inc.*, 75 F.3d 801 (2d Cir.1996), so altered the landscape with respect to the assessment of securities fraud pleadings as to compel a revision of this court's 1994 ruling insofar as it upheld the allegations with respect to the six surviving claims. In further support of this argument, they prominently cite two other decisions, one by the Second Circuit, *Lasker v. New York State Elec. & Gas Co.*, 85 F.3d 55 (2d Cir.1996), and the other by the Fourth Circuit, *Raab v. General Physics Corp.*, 4 F.3d 286 (4th Cir.1993). We disagree with their contention that these cases, or any others cited by them, changed the law in any material respect.

In pressing their original dismissal motion, defendants relied upon a long line of decisions that stressed certain key limitations on the ability of a plaintiff to plead a claim based on optimistic or favorable statements by corporate spokesmen that were followed by the disclosure of adverse developments. (*See* Defs.' Mem. in Supp., dated Nov. 15, 1993, at 18–30). These decisions held *inter alia* that general statements praising past corporate performance or expressing optimism for the future or touting corporate expectations are not ordinarily actionable because investors do not, and cannot reasonably, rely on

such statements in making investment decisions. *See, e.g., Raab*, 4 F.3d at 289; *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir.1993); *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 283–84 n. 12 (3d Cir.), *cert. denied*, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); *Zerman v. Ball*, 735 F.2d 15, 20–21 (2d Cir.1984); *Colby v. Hologic Inc.*, 817 F.Supp. 204, 210–11 (D.Mass.1993); *In re Time Warner Inc. Sec. Litig.*, 794 F.Supp. 1252, 1259 (S.D.N.Y.1992) *aff'd in part, rev'd in part*, 9 F.3d 259 (2d Cir.1993), *cert. denied*, 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994); *In re Healthco Int'l Inc. Sec. Litig.*, 777 F.Supp. 109, 115 (D.Mass.1991). These cases also made clear that a plaintiff cannot rely on a single sentence or isolated comment divorced from its context. *See, e.g., Krim*, 989 F.2d at 1447; *Colby*, 817 F.Supp. at 211; *In re Healthco*, 777 F.Supp. at 116. Defendants also relied on cases that had held that even specific predictions by corporate spokespersons will not be actionable if they are hedged with sufficient caveats or expressions of caution to ensure that the statement as a whole is balanced or, in the language of the caselaw, "bespeaks caution." *See, e.g., I. Meyer Pincus & Assocs., PC v. Oppenheimer & Co.*, 936 F.2d 759, 763 (2d Cir.1991); *Luce v. Edelstein*, 802 F.2d 49, 52 (2d Cir.1986).

Defendants additionally invoked the well-settled caselaw that has explicated the requirements of Rule 9(b) governing averments of fraud in federal pleadings and that has applied those criteria to securities-fraud allegations. (*See* Defs.' Mem. in Supp. at 30–35). Of particular pertinence are the requirements that the plaintiff allege who made the offending statement and where it was made. *See, e.g., In re Time Warner*, 794 F.Supp. at 1261; *Hershfang v. Citicorp*, 767 F.Supp. 1251, 1256 (S.D.N.Y.1991), *aff'd on reargument*, 1991 WL 197699 (S.D.N.Y. Oct.1, 1991).

---

**2.** We do not believe that defendants are arguing that a failure to dismiss the remaining extant claims would cause "manifest injustice", at least if that term is meant to convey a

more serious form of prejudice to defendants than their continued involvement in a lawsuit that they view as meritless. *See* p. 18, *infra.*

In evaluating the complaint in 1994, the District Court acknowledged and applied these criteria. Thus, it assessed each of the twenty pled statements by examining not only the wording of the quoted comment, but the surrounding language of the document in which the statement appeared. (*See* Mem. Opinion & Order, dated Aug. 19, 1994, at 12–21). In its assessment, the court also took note of and applied the governing decisional authority by dismissing allegations relating to those statements that it deemed to be mere "vacuous truisms" or "bland corporate-speak", as well as those statements that it viewed as sufficiently qualified in context to avoid the imputation that they were either false or misleading. (*Id.* at 15–16).[3] In doing so the court cited and plainly relied upon the then-most recent Second Circuit caselaw analysis.

The more recent decisions now cited by defendants do not change these basic standards. Indeed, they adhere to them.

The decision on which defendants principally rely, *Philip Morris,* involved two claims. The first was that the management of Philip Morris had deceived stock purchasers by failing to disclose that it was considering a radically different marketing plan for its premium cigarettes because of competition from the discount cigarette market[4], while making statements that suggested some optimism with respect to company prospects, which possibly implied that the company would adhere to its traditional pricing policies. *Philip Morris,* 75 F.3d at 805. According to the plaintiffs, these public pronouncements created a duty to disclose that management was considering the alternative strategy, which was likely to affect corporate profits adversely. *Id.* at 808.

In affirming the dismissal of this claim, the Circuit Court focussed on the issue of whether and when corporate management may inherit a duty to disclose that it is considering the possibility of adopting an alternative marketing plan. *Id.* at 809–810. Although the Court acknowledged that the consideration of a new approach by the Board of Directors in such a case might well be material, in the sense that an investor would want to know about it, it noted that materiality did not always translate into a duty to disclose. The key consideration, according to the Court, was whether prior public statements by the company conveyed an impression that would be misleading in light of the Board's subsequent consideration of a new plan. *Id.*

In reviewing the statements by Philip Morris that plaintiffs cited as triggering such a duty, the Court found that none conveyed the notion that the company was committed to its old pricing strategy and that none "hyped" that approach. *Id.* at 810. Most of the cited comments were either contradictory statements as to whether market share or profits would be the primary corporate goal for the next year, or statements of then-current corporate goals, and the remaining statements were deemed mere corporate "puffery." *Id.* at 810–11.

The other issue before the Court in *Philip Morris* was somewhat more pertinent to this case. Plaintiffs there contended that statements by management expressing optimism about future sales growth and profitability triggered a duty to disclose weakened sales figures for the quarter and the general lack of success of the company's traditional marketing approach. *Id.* at 811. In affirming the dis-

---

**3.** The court found other allegations legally inadequate because (1) they did not specify where the statement was made (in violation of Rule 9(b)), or (2) they misquoted or mischaracterized an otherwise harmless statement, or (3) they referred to statements that were literally true and not misleading in context. (*Id.* at 12–14, 19–20).

**4.** The plan involved cutting the price of Marlboro substantially in order to meet increasing competition from the discount cigarette brands. *Philip Morris,* 75 F.3d at 805.

missal of this claim, the Circuit Court concluded that the public statements in question were general predictions, rather than "definite positive projections," *id.* at 811 (citing *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir.1993), *cert. denied*, 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994)), and that there was no reason at that time why management should not have assumed the ultimate success of its traditional, and hitherto profitable, strategy. *Id.* Moreover, the Court observed that the upbeat predictions were "relatively subdued general comments" that were "tinged with caution", and that they included specific references to the loss of customers for the company's lead brand, Marlboro, and also noted the difficulty of predicting the future impact of the discount cigarette market. *Id.*

Finally, the Court observed that the optimistic statements in question were not shown to have been made at a time when it was already apparent to management that the decline in sales for Marlboro was significant or that a change in strategy might have to be considered. *Id.* On that basis as well, the Court held that the statements in question had not been shown, as a matter of pleading, to have been materially misleading or to have triggered a duty of further disclosure. *Id.*

As this summary underscores, *Philip Morris* did not alter the law on pleading securities fraud in the context presented by our case. At most, the Second Circuit clarified to a degree its prior decision in *Time Warner*, 9 F.3d at 267, concerning whether and when a company must disclose that it is considering a change in marketing plans. That issue is not presented by this case. Moreover, the other claim addressed in *Philip Morris* was disposed of by application of long-recognized standards, as exemplified by the repeated citation by Judge Newman to earlier Second Circuit decisions, including his own opinion in *Time Warner. See Philip Morris*, 75 F.3d at 811–12.

The other decisions principally relied upon by defendants as new law are equally unhelpful to their argument. The per curiam opinion of the Second Circuit in *Lasker v. New York State Elec. & Gas*, 85 F.3d 55, addressed a district court decision rejecting a challenge to statements in a Form 10–K that had expressed general corporate optimism and identified the corporation's commitment not to "compromise its financial integrity." *Id.* at 56. In affirming the district court's dismissal of the complaint, the Second Circuit rejected the notion that these statements either constituted promises not to undertake actions that might affect earnings or represented a guarantee of profitability. Rather, they were "precisely the type of 'puffery' that this and other circuits have *consistently held* to be inactionable." *Id.* at 59 (emphasis added).

Another decision repeatedly cited by defendants—the Fourth Circuit opinion in *Raab*—is not new law in any relevant sense. It was issued in 1993, the year before the challenged decision in this case, and it was invoked by defendants on their prior motion. (*See* Defs.' 1993 Mem. of Law at 19–20). Moreover, although *Raab* was cited with approval in *Lasker* in 1996, it did not involve any novel issues of law that might be pertinent to defendants' current challenge to the complaint in our case.

In *Raab* the Court of Appeals noted the longstanding principle that soft projections of future profitability—in that case a reference to "an expected annual growth rate of 10% to 30% over the next several years"— are not binding predictions, and it held that the statement in question was not actionable, particularly in view of the loose reference to a broad range of possible growth rates and an indefinite time frame. *Id.* at 290 (citing *inter alia Friedman v. Mohasco Corp.*, 929 F.2d 77 (2d.Cir.1991)). The Court also recognized that more pointed and specific predictions as to the future, if impliedly guaranteeing results, or opinions that falsely implied the existence of present facts, would be actionable. *Id.*

(citing *inter alia Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991)). Finally, the Circuit Court in *Raab* agreed with the district court that plaintiffs there had failed adequately to allege that the defendants' general statement of optimism about future developments constituted a false statement of beliefs or an unreasonable belief, particularly in view of the vagaries of government contracting, which was the business in which the defendant corporation was involved. *Raab,* 4 F.3d at 290–91.

Defendants also now point to the Second Circuit's decision in *Shields v. Citytrust Bancorp., Inc.,* 25 F.3d 1124 (2d Cir.1994). That decision, however, also predates the first decision in this case. Indeed, defendants specifically cited *Shields* to the District Court during the pendency of their prior motion to dismiss (*see* Aug. 2, 1994 letter from Stuart J. Baskin, Esq. to the Court), and the case was cited by the court in the opinion that defendants currently challenge. (*See* Mem. Opinion & Order at 17). Moreover, *Shields* suggests no alteration in legal standards. To the extent pertinent, it reiterates that expressed optimism by corporate management about the future of the company is not rendered actionable merely because subsequent events demonstrate that the optimism was misplaced. Such forward-looking statements do not constitute fraud unless the facts known to the speaker at the time of the statement rendered the prediction reckless when made or suggest that the speaker knew, at the time of his prediction, that it was based on false premises. *Id.* at 1129–30. In our case, the court applied this standard in assessing the plaintiffs' claims, and on the basis of that assessment determined that six of the twenty cited statements were actionable.

In short, defendants fail to demonstrate that the law pertinent to plaintiffs' current claims has changed in any material way since August 1994. Accordingly, this is not a viable basis for ignoring the normal presumption of adherence to prior rulings in the case.

### C. Implied Errors in the Original Ruling

 Defendants do not explicitly argue that the prior decision by the District Court constituted clear error. Nonetheless, to the extent that they suggest that the court should compare the statements in this case to those at issue in *Philip Morris* and similar cases (Tr. 13–17), the implication is certainly made that the prior decision was wrong and that the court should therefore reexamine it.

As we have noted, courts do not readily reconsider prior rulings in a case merely on the assertion that the original decision was incorrect. This presumption is not inflexible, since the court always has discretion to reconsider a previous ruling, but, absent clear error or significant prejudice, the goal of efficient adjudication embodied in the law-of-the-case doctrine would be disserved by permitting routine revisiting of decided issues. *See, e.g., County of Suffolk,* 106 F.3d at 1117; *Strauch v. Demskie,* 892 F.Supp. 503, 506 (S.D.N.Y.1995).

We do not see clear error in the court's prior decision, even judged in light of the holdings of the Circuit Court in *Philip Morris.* In reaching this conclusion, we take particular note of an extended comment by Judge Newman in *In re Time Warner Secs. Litig.,* 9 F.3d at 263–64, concerning the impact of competing policies on the assessment of pleadings under the securities laws.

The Court in *Time Warner* noted both the interest in "deterring fraud in the securities markets"—an interest served by the normally liberal pleading standards under Rule 12(b)(6)—and the potentially competing interest in "deterring the use of the litigation process as a device for extracting undeserved settlements as the price of avoiding the extensive discovery costs that frequently ensue once a com-

plaint survives dismissal . . . ." *Id.* at 263. Judge Newman observed, in terms pertinent to the argument pressed by defendants,

It has never been clear how these competing interests are to be accommodated, and the adjudication process is not well suited to the formulation of a universal resolution of the tensions between them. In the absence of a more refined statutory standard than the vague contours of section 10(b) or a more detailed attempt at rulemaking than the SEC has managed in Rule 10b–5 . . . courts must adjudicate the precise cases before them, striking the balance as best they can.

*Id.* at 263–64. As the Court recognized, this "common law approach to what is supposed to be a statutory standard" has inevitably led to "several consequences." *Id.* at 264. Of particular note, "our outcomes will not necessarily evolve a discernible pattern [and] the absence of a clear pattern will inevitably create uncertainty in the fields of both securities and litigation." *Id.* at 264.

The point for our case is that the assessment of the legal status of a purportedly fraudulent statement is highly fact-specific, and requires a case-by-case analysis. Thus, reliance on general nostrums from other cases is unlikely to yield an unerring answer in any given case. Hence, even if some of the challenged 1994 rulings in our case were arguably inconsistent with some of the general observations in *Philip Morris*, they are not so plainly wrong as to justify redoing that decision.

This conclusion is reinforced by the somewhat unusual procedural posture of this case. Fact discovery has been essentially completed, and defendants have represented that, if any part of the case survives their renewed Rule 12(b)(6) dismissal motion, they will next move for summary judgment. This is of some significance in view of the fact, noted in *Time Warner*,

that the stringency of the rules governing the pleading of securities fraud claims emanates from the concern that the prospect of burdensome discovery may coerce unjustified settlements. *Id.* at 263. In this case, however, discovery—concededly of fairly heroic proportions—has already been conducted, and hence a refusal to dismiss the remaining extant claims will not expose defendants to the perceived problem of litigation blackmail.[5]

On balance, then, we recommend denial of the motion to dismiss without a detailed reexamination of the legal sufficiency of the claims that were previously held by this court to be legally sufficient.

## II. *The Motion to Amend*

Plaintiffs have moved for leave to serve a third amended consolidated complaint. The proposed amendments have several purposes. First, the proposed new pleading—the most recent version of which is found in plaintiffs' reply papers in support of their motion—drops a number of allegations that formed the basis for the claims that the court dismissed in 1994. Second, the plaintiffs seek to add a claim premised on a statement during the class period by Nortel's Chief Executive Officer in which he offered a very optimistic projection of the company's likely performance in 1993. Third, plaintiffs allege additional claims premised on a series of optimistic statements assertedly made by several spokespersons for Nortel during the course of telephone conferences with groups of market analysts during the class period. Fourth, and finally, plaintiffs press a new claim to the effect that Nortel used improper accounting methods to arrive at the data that it released in its 1992 and 1993 financial disclosures, and that in doing so it artificially and misleadingly inflated the revenue figures for the first quarter of 1993 as well as for fiscal year 1992.

---

5. We also note that, for reasons to be summarized, plaintiffs' motion to amend should be granted in part, thus ensuring the continuation of the case in any event.

Defendants, citing *Philip Morris* and the other caselaw invoked on their motion to dismiss, argue that the proposed amendments should be denied because the allegations about the newly cited statements are insufficient as a matter of law to provide a basis for a securities fraud claim. Thus, they assert that predictive statements of the nature described here are not actionable, because investors do not rely on them. They further argue that the allegations concerning the statements allegedly made to the analysts are not a basis for legal action because the complaint fails to plead facts demonstrating that Nortel or an identified corporate representative was responsible for providing the asserted misinformation that the analysts then subsequently disseminated in their market reports. Finally, with respect to the asserted misleading financial data published by Nortel, defendants argue that plaintiffs fail to plead the necessary detailed facts and simply rely on a vague and presumably unreliable article published in a North Carolina newspaper.

We start by noting that Fed.R.Civ.P. 15(a) gives the trial court some discretion as to whether to permit a party to amend his pleadings. *See, e.g., John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir.1994); *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir.1993). The court is to grant such relief "freely ... when justice so requires," and this provision has been liberally interpreted by both the Supreme Court, *see, e.g., Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), and the Second Circuit. *See, e.g., United States v. Continental Illinois Nat'l Bank & Trust Co. of Chicago*, 889 F.2d 1248, 1254 (2d Cir.1989).

As the Second Circuit has noted, leave to amend should be granted "if the [movant] has at least colorable grounds for

relief ... unless the [movant] is guilty of undue delay or bad faith or unless permission to amend would unduly prejudice the opposing party." *S.S. Silberblatt, Inc. v. East Harlem Pilot Block–Bldg. 1 Housing Dev. Fund Co., Inc.*, 608 F.2d 28, 42 (2d Cir.1979) (citations omitted). As this frequently reiterated formulation [6] suggests, however, permission may properly be denied if "the amendments would not serve any purpose ... [or present] 'at least colorable grounds for relief.'" *Kaster v. Modification Sys., Inc.*, 731 F.2d 1014, 1018 (2d Cir.1984)(quoting *inter alia S.S. Silberblatt, Inc.*, 608 F.2d at 42). *See, e.g., In re American Express Co. Shareholder Litig.*, 39 F.3d 395, 402 (2d Cir.1994); *John Hancock Mut. Life Ins.*, 22 F.3d at 462; *Manson v. Stacescu*, 11 F.3d 1127, 1133 (2d Cir.1993), *cert. denied*, 513 U.S. 915, 115 S.Ct. 292, 130 L.Ed.2d 206 (1994).

Defendants argue that the proposed amendments would be futile, since the new allegations are insufficient as a matter of law to state a cognizable claim and hence would be dismissible under Rule 12(b)(6) or Rule 9(b). If they are correct in their legal analysis, the amendments, at least insofar as they pertain to the addition of new claims, should be denied. *See, e.g., Chill v. General Elec. Co.*, 101 F.3d 263, 271–72 (2d Cir.1996)(amendment properly denied as futile); *Yerdon v. Henry*, 91 F.3d 370, 378 (2d Cir.1996). We address each of the objections separately.

The first of the newly cited statements is a comment attributed to Paul G. Stern, Nortel's Chief Executive Officer and Chairman of the Board. In a report in the *Dow Jones News Service* dated January 23, 1993, Mr. Stern was quoted as saying that he was not as "bullish as the rest of the world in terms of the upturn in the economies, although we still expect to have a record year in 1993." He then went on to add that "if I'm wrong about the econo-

---

**6.** *See, e.g., Continental Illinois*, 889 F.2d at 1255; *Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 653 n. 6 (2d Cir.1987); *Resorts & Motel Advancement Dev. Agency,* *Ltd. v. Sloan*, 160 F.R.D. 449, 451 (S.D.N.Y. 1995); *Int'l Paving Systems, Inc. v. Van–Tulco, Inc.*, 866 F.Supp. 682, 691 (E.D.N.Y. 1994).

my this year and it turns up the way economists are saying it will, then, hell, we'll be in great shape." (*See* Proposed Third Am. Compl. at ¶ 28). Defendants urge that these comments constitute vague predictions tinged with caution, and thus do not constitute the type of information that investors can be expected to rely upon.

In assessing the legal adequacy of plaintiff's allegations, we bear in mind that, even in the case of securities fraud claims, dismissal for failure to state a claim under Rule 12(b)(6) is permissible only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), *quoted in In re Time Warner Inc. Secs. Litig.*, 9 F.3d at 263. Nonetheless, we also recognize that our circuit court has endorsed a fairly searching and skeptical examination, even under Rule 12(b)(6), of statements cited as the basis of a claim of fraudulent or reckless misrepresentation. *See, e.g., Philip Morris*, 75 F.3d at 810–11; *In re Time Warner*, 9 F.3d at 263.

In context, we believe that a reasonable trier of the facts could interpret Mr. Stern's comments as predicting that, irrespective of how the economy as a whole fared in 1993, Nortel would exceed its profit margin of the preceding year and that if the economy performed in accordance with the economists' predictions, the company's profits for 1993 would substantially exceed those of the preceding year. Even given this reading of the statement, however, there remains the question of whether it can fairly be viewed as a representation that might be relied upon by a reasonable investor.

The cases that have addressed the legal significance of such forward-looking statements have not offered rules of sufficiently general applicability to permit ready resolution of this question. Defendants cite as support several corporate statements from the *Philip Morris* decision that were held

not to be actionable. Since one or two bear a striking resemblance to Mr. Stern's quoted comments, *see, e.g.,* 75 F.3d at 806 ("we expect to do better this year than last"), defendants invite us to draw the conclusion that Stern's remarks are not actionable. This is an oversimplification.

In effect, defendants appear to make the same erroneous assumption as they accuse plaintiffs of indulging in—judging the legal significance of a statement in the abstract. The context here distinguishes *Philip Morris* from this case.

In *Philip Morris* the Court deemed the predictive statements at issue not to be actionable, noting that they "reflect hope, adequately tinged with caution, and that the total mix of information available to the market cannot reasonably be found to be misleading." 75 F.3d at 811. In explanation, the Court offered three justifications for its conclusion. First, it noted that at the time Philip Morris was pursuing its traditional pricing policies and that there was no basis "for inferring that the company was unreasonable in believing that its historic marketing strategy had a high likelihood of success." *Id.* Second, the Court observed that even the most optimistic of the cited statements by Philip Morris were worded in very general and cautious terms, and in support of that observation it cited the following comments: "the company *should* deliver income growth consistent with its historically superior performance" and "we are optimistic about 1993." *Id.* (emphasis in original). Third, the Court pointed to the fact that these statements had been accompanied by information disclosing the very problem—the loss of customers from Marlboro to discount brands—that assertedly should have dictated a far more pessimistic outlook, as well as by specific cautions about the difficulty of predicting future market sales patterns, particularly with regard to discount cigarette sales. *Id.*

We see no comparable circumstances in the "Rule 12(b)(6)" record before us.

First, judged by the allegations of the complaint and the text of the relevant accompanying documents, plaintiffs may be able to demonstrate that, given the alleged major technical problems with Nortel's most important equipment and its alleged customer-relations crisis, there was no reasonable basis for Stern to have held the belief in January 1993 that the company could surpass its 1992 performance and still less basis for such a prediction if the economy weakened.

Second, the cited statement of Stern was certainly stronger than the statements quoted by the Second Circuit in *Philip Morris*. Stern's statement can be read as predicting a fairly clear minimum profit level even in an economic downturn, and as further predicting an even better result if the economy performed as economists had forecast. This is a far cry from the general suggestion in *Philip Morris* that the company "should" perform consistently with its past "historical" pattern or that management was "optimistic about 1993."

Third, the allegations of the complaint indicate that the technical problems with Nortel's switching equipment and the strong negative feedback from its customers had not been publicly disclosed at the time of Stern's comments. Moreover, the press report that quoted Stern contained no caveat as to the unreliability of such predictions or the difficulty of estimating future profits.

We recognize that the courts are justifiably skeptical of the significance that should be attached to general statements of optimism, *see generally Shields*, 25 F.3d at 1129–30; *Raab*, 4 F.3d at 289–90, as well as to expressions of opinion, if reasonably and honestly held. *See, e.g., Friedman*, 929 F.2d at 79. If, however, the prediction is sufficiently specific, it may be actionable if made recklessly, *e.g., Goldman v. Belden*, 754 F.2d 1059, 1068–69 (2d Cir.1985), or if it implies a state of current facts that is false. *See Virginia Bankshares*, 501 U.S. at 1094, 111 S.Ct. 2749.

We conclude that, as a matter of pleading, plaintiffs adequately allege facts that, if proven, can provide the basis for holding Stern's statement to be actionable. Specifically, the allegations would permit plaintiffs to demonstrate that Stern's predictions were made recklessly, that the comments falsely implied at least the absence of such extreme problems as plaintiffs contend the company was already encountering, and that they were couched in terms sufficiently definite and unqualified by cautionary language as to invite reliance by investors when determining whether to purchase shares or options of Nortel.

In sum, we conclude that plaintiffs allege a cognizable claim based on Mr. Stern's statements. Accordingly, their motion to amend to add this claim should be granted.

The next set of challenged allegations concern statements about Nortel's 1993 prospects that were made by various independent analysts in published reports. Plaintiffs seek to attribute these statements to Nortel, since the analysts had all attended specified conferences with Nortel spokespersons at which corporate performance and outlook were discussed.

Defendants oppose this set of amendments on the ground that they do not comply with the requirements of Rule 9(b) because they do not allege in specific terms who at Nortel made what specific statements that were then repeated by the analysts. Defendants also suggest that at least some of these allegations are deficient because they offer no basis for inferring that Nortel was the source of, or otherwise responsible for, the challenged statement. We conclude that, with one exception, these objections are meritless.

The principal argument invoked by defendants is an outgrowth of the Rule 9(b) requirement that a claim alleging fraud include an identification of the speaker whose utterance is alleged to have been fraudulent. As applied in this context, the courts have held that Rule 9(b) bars claims

alleging that a reporter or analyst, in reliance on representations by an unidentified corporate spokesperson, made public statements about a company that were untrue or misleading. *See, e.g., Time Warner*, 9 F.3d at 265. In substance, the plaintiff is required to name the corporate source of the misrepresentation.

In the proposed Third Consolidated Amended Class Action Complaint, plaintiffs have cited a number of statements made by various independent analysts in early 1993, touting what appear to have been optimistic projections by Nortel spokespersons about the company's prospects for the year. Defendants' objection to these allegations consists principally of the contention that they do not identify a specific corporate source for these statements and alternatively that they fail otherwise to provide a basis for holding the corporation liable for the assertedly misleading comments.

A corporation can be held liable for false or misleading statements by outsiders if the corporation was responsible for the statement. This requirement is satisfied, for pleading purposes, if the plaintiff alleges that the outsider is reiterating information provided by an identified corporate spokesperson or by a corporate document—typically a press release—that has been publicly disclosed. *See, e.g., Time Warner*, 9 F.3d at 265. This standard is also met in situations in which the corporation has "placed its 'imprimatur' on [the] analysts' reports." *Id.* (citing *inter alia Alfus v. Pyramid Technology Corp.*, 764 F.Supp. 598, 603 (N.D.Cal.1991)). *See also Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 162–63 (2d Cir.1980). Although plaintiffs' allegations in their original proposed third amended complaint might have been vulnerable to challenge based on a failure to allege these circumstances, their most recent version of the amended pleading satisfies these requirements except in one instance.

Thus, in paragraph 36 plaintiffs refer to a report by an analyst for Scotia McLeod,

and specify an assertedly false statement in that report to the effect that Nortel's management was optimistic about the projected performance of the company in 1993. Plaintiffs proceed to allege that this representation was made by a corporate spokesperson during a conference call on January 26, 1993, participated in by the author of the report and three named senior officers of Nortel. Although the complaint does not specify which of these three officers supplied the allegedly false information, we view this identification as sufficient to satisfy the requirements of Rule 9(b) as well as the pleading requirement that the complaint specify that the analyst's statement was attributable to the corporation.

Similarly, in paragraph 66 of the proposed pleading, plaintiffs cite a report by Goldman Sachs to the effect that Nortel management had predicted that the corporate performance in the last three quarters of 1993 would follow the pattern of 1992 by showing significant improvement over the first quarter. Plaintiffs allege that this assertedly false or reckless statement had been conveyed to the Goldman Sachs analyst during an April 27, 1993 telephone conference call that included as participants four named Nortel officials. Again we view this allegation as sufficient to satisfy Rule 9(b) and other pleading requirements.

In paragraphs 73 and 75 of the amended complaint, plaintiffs cite reports by First Boston and Burns Fry, respectively, that also expressed an optimistic view, "based on conversations with the company", as to Nortel's likely performance in the last three quarters of 1993. Again plaintiffs allege that the source of this information was the April 27, 1993 telephone conference to which they previously alluded, and they again name the Nortel participants in that discussion.

Next, in paragraph 81 plaintiffs allude to another Goldman Sachs report predicting a specific figure for per-share profits for

the second quarter. They then allege that the information on which this allegedly wildly over-optimistic assessment was based had been provided to the analyst during a meeting with two identified Nortel representatives.

A similar set of allegations is found in paragraph 83, which quotes a similar prediction from a report by an analyst for Brown Brothers Harriman. In this case plaintiffs allege that the author had relied on false or misleading information provided by identified spokespersons at two telephone conferences described earlier in the complaint.

The foregoing allegations are, as noted, sufficient to pass muster under Rule 9(b). The proposed new pleading does, however, contain one set of allegations that suffers from the same failing as the pleadings in *Time Warner*. Thus, in paragraph 96 plaintiffs quote from a June 28, 1993 Salomon Brothers report that revised its estimate of per-share profits, assertedly on the basis of a discussion "with management" over the preceding weekend. Although plaintiffs refer to the author's participation in several specific conferences with identified Nortel officials in earlier months, it offers no identification of which Nortel personnel participated in the weekend discussion to which the Salomon report alluded, alleging simply that that it was with "management" or "the senior management team". Although plaintiffs may be seeking to imply that the misleading statements were provided by one or more of the same individuals referenced earlier in the complaint, we view the reference to "management" or the "senior management team" as not meaningfully more specific than the reference to "Time Warner executives", which was found insufficient in *Time Warner*, 9 F.3d at 265 & n. 2.

Plaintiffs have similarly failed to allege facts sufficient to infer that the statement is attributable to the defendants because the company has left its imprimatur on the Salomon report. Third-party statements embodied in an analyst's report may provide the predicate for liability where it is alleged that the defendants have "sufficiently entangled themselves" with the creation or issuance of the report such as to have expressly or impliedly adopted the statements. *See Elkind*, 635 F.2d at 163. Indicia of entanglement may include a corporation's review, correction and approval of a final version the analyst's report. *See, e.g., In re ICN/Viratek Securities Litig.*, 1996 WL 164732, at *4–6 (S.D.N.Y. April 9, 1996); *Alfus*, 764 F.Supp. at 603. The allegation that the challenged statement was based on information provided by Nortel management does not suggest the kind of control or cooperation in the issuance of the report necessary to render defendants liable for its content. *See, e.g., Time Warner*, 9 F.3d at 264; *Raab*, 4 F.3d at 289; *In re Nokia Corp. Sec. Litig.*, 1998 WL 150963, at *8 (S.D.N.Y. April 1, 1998).

In sum, we conclude that the plaintiffs' allegations about the analysts' reports are sufficient, with one noted exception, to plead the liability of the corporation based on the identification of several Nortel officials as responsible for distributing to those analysts the misleading or false information that the analysts then passed on to the public. The one exception is, as noted, the claim with respect to the June 28, 1993 report of Salomon Brothers.

The remaining new claim concerns the so-called revenue recognition practices of Nortel in reporting the results of 1992 and the first quarter of 1993. Plaintiffs allege, on information and belief, that the company's reports for those two periods were false because the figures representing revenue had been deliberately and improperly inflated by treating equipment as sold when it was merely placed in inventory. The allegation is made on information and belief, according to plaintiffs, because defendants have heretofore successfully resisted production of accountant work papers in the possession of its outside accountants. Plaintiffs contend that the allegation is not mere speculation, but rather

is based on information acquired in discovery. In particular, plaintiffs cite a marked-up copy of a newspaper article that was found in the files of Nortel's accountants, which reported that an unidentified analyst had disclosed the assertedly improper accounting practice. (*See* Proposed Third Amend. Compl. at ¶¶ 33, 112).

In arguing against the inclusion of this claim in the amended complaint, defendants assert that these allegations do not satisfy either Rule 9(b) or Rule 8, principally because they are made on information and belief and because they appear to be based solely on the newspaper report of an anonymous source. We disagree with the implication of defendants' argument, which appears to conflate the standards for pleading and proving fraud.

■ Rule 9(b) requires that the plaintiff, when pleading a claim of fraud, specify what was said, who uttered the assertedly fraudulent statement, when and where the statement was made and what aspect of the statement was false. *See Acito v. IMCERA Group, Inc.,* 47 F.3d at 47, 51 (2d Cir.1995); *Shields,* 25 F.3d at 1127; *Duncan v. Pencer,* 1996 WL 19043, at *7 (S.D.N.Y. Jan.18, 1996). Additionally, the plaintiff must provide some factual basis for inferring the requisite fraudulent intent on the part of the defendant. *See Chill,* 101 F.3d at 267; *Acito,* 47 F.3d at 51.

Plaintiffs' proposed pleading meets these requirements. It identifies the statements in question by referring specifically to the financials issued by Nortel for the two specified periods. (*See* Proposed Third Amend. Compl. at ¶¶ 27, 42, 63). This allegation also satisfies the requirement that the speaker and time frame be identified, since the annual and quarterly reports of the company are issued by and on behalf of Nortel at specified times of the year. *See, e.g., Degulis v. LXR Biotechnology, Inc.,* 928 F.Supp. 1301, 1311 (S.D.N.Y.1996); *Furman v. Sherwood,* 833 F.Supp. 408, 417 n. 6 (S.D.N.Y.1993);

*Quantum Overseas, N.V. v. Touche Ross & Co.,* 663 F.Supp. 658, 667–68 (S.D.N.Y. 1987). Plaintiffs also identify in sufficiently concrete terms what aspect of the statements was false and in what respect, that is, the inflation of the revenue figures, and thus of profits, by virtue of the inclusion in total sales and revenues of equipment that had just entered inventory.

We also view the allegations as sufficient to suggest the requisite scienter on the part of defendants. The complaint alleges repeatedly that Nortel's sales and future prospects were flagging by late 1992 because of major performance problems with the key switching equipment manufactured by the company, and it further alleges in specific terms that, by a variety of stratagems, senior officials at Nortel sought to conceal these technical problems and the downturn in the company's financial circumstances and business prospects. Given these specific allegations, plaintiffs' further assertion about the use of an improper accounting method that had the effect of overstating profits suffices to permit the inference, alleged by plaintiffs, that the use of this methodology was intended to mislead the investing public in much the same manner as the various allegedly false or deceptive public statements cited in the complaint.

■ In pressing their contention that the complaint does not meet Rule 9(b) standards, defendants argue that pleading on information and belief is improper in this circumstance. Although such pleading is ordinarily not sufficient, see, e.g., *Time Warner,* 9 F.3d at 265; *DiVittorio v. Equidyne Extractive Industries Inc.,* 822 F.2d 1242, 1247 (1987), that general rule is not inflexible and gives way in appropriate circumstances. *See, e.g., Wexner v. First Manhattan Co.,* 902 F.2d 169, 171 (2d Cir. 1990); *Stern v. Leucadia Nat. Corp.,* 844 F.2d 997, 1003 (2d Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988). Such circumstances can be found in this type of case. Specifically, a share-

holder who has reason to believe that a company may be guilty of accounting improprieties of the type alleged here is unlikely to have sufficient information as to the practice, prior to discovery, to permit pleading other than on "information and belief". Accordingly, if there is at least a colorable basis for the allegation—which we believe is satisfied in this case by plaintiffs' discovery in the files of Nortel's accountant of a marked copy of the article quoted in the complaint—the pleading is adequate.

■ Defendants' backup argument on this point is that plaintiffs have in fact had massive discovery and have not cited in their pleading any additional evidence to support their charge of accounting impropriety. We view this argument as unpersuasive because, although Rule 9(b) requires the pleading of certain specifics, it does not require a recitation of evidence to demonstrate the falsity of the allegedly fraudulent statement. *See generally Kirlin v. Conopco, Inc.*, 1996 WL 263026, at *2 (S.D.N.Y. May 16, 1996); *Lomaglio Assocs. Inc. v. LBK Marketing Corp.*, 892 F.Supp. 89, 94 (S.D.N.Y.1995); *Lee v. Kim*, 1994 WL 586436, at *5 (S.D.N.Y. Oct.25, 1994).

As for Rule 8, all that it requires is a short and plain statement of the facts giving rise to the asserted claim. That we find in the proposed pleading. Plaintiffs allege a false statement of fact that can fairly be expected to induce reliance by the targeted segment of the public, and they further allege knowledge by defendants of the falsity of the statement or their recklessness with regard to the truth.

■ Defendants' principal argument on this point concerns the asserted absence of concrete evidence that the statements in question—the financials for 1992 and the first quarter of 1993—are false. The question of evidentiary sufficiency is, however, not properly addressed when we are assessing only the facial adequacy of a pleading, whether under Rule 12(b)(6) mo-

tion or Rule 15(a). *See, e.g., De Jesus v. Sears Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir.1996), *cert. denied*, 519 U.S. 1007, 117 S.Ct. 509, 136 L.Ed.2d 399 (1996)(citing *inter alia Goldman*, 754 F.2d at 1066); *ESI Montgomery County, Inc. v. Montenay Intern. Corp.*, 1996 WL 22979, at *5 (S.D.N.Y. Jan.23, 1996); *Cashman v. Montefiore Medical Center*, 1993 WL 227700, at *4 (S.D.N.Y. Jun.21, 1993). The adequacy of plaintiffs' proof can be placed in issue on a summary judgment motion, but defendants have yet to file such a motion.

In sum, we conclude that the allegations regarding defendants' revenue-recognition practices are sufficient to survive Rule 12(b)(6) and 9(b) scrutiny. Whether plaintiffs can sustain those allegations in the face of an evidentiary challenge is a matter that we are not called upon to decide at present. All that we need determine is whether the inclusion of this claim in the proposed amended complaint would be futile because of the absence of allegations of a colorable claim. Since the allegations are sufficient as a matter of pleading, the amendment should be permitted.

### CONCLUSION

For the reasons noted, I recommend that defendants' renewed motion to dismiss the complaint as presently constituted be denied, and I further recommend that plaintiffs' motion to amend the complaint in the format represented by the second version of the proposed Third Consolidated Amended Class Action Complaint be granted to the extent noted.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Miriam G. Cedarbaum, Room 1330, and to the chambers of the undersigned, Room 1670. Failure to file timely objections may constitute a waiver of those

**252**

objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).